Eddie Lee **SCHIELER**, Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. CV F 76–188–MDC.

United States District Court,
E.D. California.

Aug. 4, 1986.

John T. Murphy, Modesto, Cal., for plaintiff.

Mark St. Angelo, Asst. U.S. Atty., Fresno, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER OF DISMISSAL.

CROCKER, Senior District Judge.

This trial was bifurcated to try the issue of "discretionary function" exception to the Tort Claims Act [28 U.S.C. § 2680(a)].

Plaintiff was injured when struck by lightning while standing on Moro Rock in Sequoia National Park on August 20, 1975, at a time when park visitors were not warned of the danger of lightning strikes.

Plaintiff's complaint alleges that the National Park Service "negligently and care- lessly failed to provide any warning, guidance or supervision at all in respect of the danger of being struck by lightning atop Moro Rock or of the fact that such a storm was impending, and, in any event, failed to provide and maintain reasonable or any safety devices to de-electrify the observation area." Complaint, p. 3:5–9. Plaintiff points out in his arguments that most of the evidence produced by the Government has been directed toward provision of a warning sign at Moro Rock, and does not address other possible methods of warning or the provision of safety devices in the observation area. In addressing the issue here, the Court considers the duty to warn as encompassing the provision of a sign or any other method of warning, as well as the provision of safety devices.

The discretionary function exception to the Federal Tort Claims Act (FTCA) at issue here is set out in 28 U.S.C. § 2680(a), which reads as follows:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Plaintiff contends his claim is not barred by the discretionary function exception of the FTCA. He contends that failure to warn does not fall within the exception. In order to fall within the exception, the act or omission must be based upon an affirmative decision by the Government that it will act or refrain from acting. Further, he argues that under California law, the Government as a landowner cannot be excused from exercising ordinary care in the management of its premises for the safety of persons coming on the land—it is a duty owed and it is not conditional or discretionary.

The Government contends that the presence or absence of any warnings or safety devices in the area of Moro Rock is a decision that is within the discretion of the National Park Service, and that as a result, the discretionary function exception of the FTCA is applicable, and the court is without subject matter jurisdiction to consider the plaintiff's claim.

The mission of the National Park Service is defined in 16 U.S.C. § 1, as follows:

[T]o promote and regulate the use of the Federal areas known as national parks ... by such means and measures as to conform to the fundamental purpose of said parks, monuments and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

This section gives very broad discretionary power to the agency to promote and regulate the parks in such a manner that the scenery and natural and wild life in the parks are preserved unimpaired so that they may be enjoyed presently and in the future.

Exhibit 1, entitled "Management Policies" issued by the National Park Service in 1975, at page 13 states: "Signs of all types should be held to the minimum number, size and wording required to serve the intended function without loss of scale or readability." The testimony established that in keeping with that policy and to enforce compliance, the Superintendent of Sequoia National Park established a sign committee. This committee determined that as a prerequisite to placing of a sign within the park a manifest need for it must be demonstrated, and that none had been shown for Moro Rock because there was no prior record of lightning striking it.

The resolution of the issue here is dependent upon the application of *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and *United States v.*

*S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *See also Begay v. United States,* 768 F.2d 1059, 1062 (9th Cir.1985), which holds that the discretionary function exception applies "to a case not involving strictly 'regulatory' action of an agency."

Although *Dalehite, supra,* set out rather broad limits for the application of the discretionary function exception, the courts, following the decision in *Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), began diminishing the immunity from suit of the federal government. As the Ninth Circuit stated in *Begay, supra,* at 1063, the dimunition of immunity for the federal government was to spread the economic loss suffered by the individual plaintiff, but was not achieved without great difficulty in determining when the discretionary function exception should or should not apply. In the past, the Ninth Circuit used the planning-level/operational-level dichotomy when analyzing the application of the discretionary function exception. In light of the *Varig* decision, the Ninth Circuit stated that the proper approach to determining this issue is for the court to look to the nature of the conduct in question. *Begay, supra,* at p. 1062 n. 2. In providing the discretionary function exception, it was the intention of Congress to prevent judicial second-guessing of legislative and administrative decisions grounded on social, economic and political policy through the medium of an action in tort. *Begay,* 768 F.2d at 1064. To accomplish their policy objectives, the agencies must balance these objectives against such practical considerations as staffing and funding. Judicial second-guessing of decisions arrived at through the balancing process is what is protected by the discretionary function. *Varig,* 467 U.S. at 820, 104 S.Ct. at 2678.

The plain wording of 16 U.S.C. § 1, leaves the determination of the regulation, care and preservation of the parks to

the National Park Service. The discretionary function exception would therefore apply to any decisions made pursuant to the activities and decisions of the park service in carrying out the Congressionally mandated mission of the park. The conduct involved here is the failure to warn of the danger of lightning strikes at Moro Rock or provide reasonable safety devices. This conduct involves a decision by park administration or executives which presents many alternatives: Whether or not to warn; if warning is decided upon, the type of warning; and in this case, would warnings of possible lightning strikes be placed where lightning had struck before or only on or near those objects considered to be good conductors of lightning of which there are many in Sequoia National Park. Plaintiff suggests a general warning be printed in the handout given to all persons entering the park. If this should be done, would it not require a decision by a park administrator or officer as to which areas should be included in the warning? That in turn could entail the hiring of an expert to advise the park personnel of the proper areas to include in the danger areas. The conduct here involved requires a decision, and that decision calls for the exercise of judgment and discretion by administrators and officers of the park service. Any attempt by the court to evaluate such a decision would require it to examine park service priorities in its administration of the park and question decisions made for policy reasons.

The Government has shown that the National Park Service had formulated a policy of keeping signs in the parks to a very minimum, such policy having been arrived at after very high level debate. A sign committee had been appointed in Sequoia National Park, as required by national policy, which was to recommend to the Superintendent of the park what signs should be posted. The committee had determined that no signs would be posted unless a manifest need had been demonstrated. While posting of warning of lightning strikes is but one manner of warning, it clearly demonstrates that any type of warning would require the exercise of judgment and discretion by the park service personnel, which requires considerations impacting the social and economic policy of the agency. "Formulating and issuing warnings requires the government 'to establish priorities for accomplishment of its policy objectives sought to be obtained against such practical considerations as staffing and funding.' *Varig,* 104 S.Ct. at 2768." *In Re Consolidated U.S. Atmospheric Testing Lit.,* 616 F.Supp. 759, 776 (N.D.Cal.1985). A review of the decision, or of failure to make such a decision, would encroach into the decision-making process of the park service. The discretionary function exception is intended to protect this process, and the courts are barred from reviewing the same in a tort action.

This conclusion is supported by the decisions of the Ninth Circuit on this issue since *Varig. See Chamberlin v. Isen,* 779 F.2d 522 (9th Cir.1985); *Cunningham v. United States,* 786 F.2d 1445 (9th Cir.1986); and *Mitchell v. United States,* 787 F.2d 466 (9th Cir.1986). Further, in *Begay, supra,* at 1066, the Ninth Circuit stated that "the decision not to warn of potential safety hazards 'was clearly the type of decision of an agency which Congress sought to protect from judicial review under the Tort Claims Act.' "

■ Plaintiff contends that the discretionary function exception does not apply to bar his action because under California law, the Government as landowner is required to exercise ordinary care in the management of its premises for the safety of persons coming on that land. However, if the act complained of falls within the discretionary function exception, plaintiff's action is barred, and it is irrelevant that the government was negligent. In *Mitchell v. United States,* 787 F.2d 466, 468 (9th Cir. 1986), the court states:

Mitchell argues that "BPA was without discretionary authority to breach the

duty of care imposed by Washington law." Negligence, however, is irrelevant to the discretionary function issue. The FTCA itself exempts discretionary functions "whether or not the discretion involved be abused." 28 U.S.C. 2680(a).

◼ Lastly, plaintiff here argues that the discretionary function cannot apply unless the National Park Service made an affirmative decision not to warn of the dangers. That argument is answered in *In Re Consolidated U.S. Atmospheric Testing Lit.*, 616 F.Supp. 759 (N.D.Cal.1985). In that case, the plaintiffs argued that the exception could not apply in the absence of a conscious decision. The Court there stated:

> If the decision to issue or not to issue a "warning" is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a "decision"? Would a decision to defer a decision be a "decision"? Would the government be subject to liability for failing to act where operational employees conducting the relevant research consider the evidence as yet insufficient for making a decision? As the Supreme Court said in *Varig*, one must look to "the nature of the conduct" to determine whether the exception applies. In this case, the relevant conduct is the issuance of "warnings" not the decisionmaking process or the failure to make a conscious, explicit decision.

616 F.Supp. at 776–777. Accordingly, in that case, the Court dismissed plaintiffs' claims based on the same argument as plaintiff advances here.

For all of the foregoing reasons, the actions complained of by plaintiff here are within the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and the case is dismissed for lack of subject matter jurisdiction.

# Management Policies

**U.S. DEPARTMENT OF THE INTERIOR NATIONAL PARK SERVICE 1975**

EXHIBIT

1

PENGAD—Bayonne, N.J.

## INTRODUCTION

The last decade has been a time of ferment and growth for the National Park Service and of change in the legislative framework underpinning System planning and management. The revised Management Policies of the National Park Service reflect not only these changing conditions and new laws, but also a growing body of management philosophy regarding appropriate levels of visitor use, preservation of historic properties, and management of park ecosystems.

These revised policies are supported by the National Environmental Protection Act of 1969. They provide for public involvement and for the assessment of environmental impacts in the Service's planning process. They carry forward congressional and administrative policy through new safeguards for historic preservation.

During the next few years, we can expect the passage of legislation establishing individual wilderness areas in over fifty of the parks. As the period of wilderness studies and recommendations draws to a close, we must give greater attention to the preservation, management, and use of the wilder-

ness and backcountry portions of the parks. We have already prepared plans to regulate and direct backcountry use—use that is now increasing at a disproportionate rate to other park visitation. Such planning is important since most of the land and waters in the System are in these categories.

Our management guidance must also recognize the diversity of areas in the System, a diversity which is increasing with the addition of major urban recreation areas such as Golden Gate in San Francisco, Gateway in New York and New Jersey, and the Cuyahoga Valley between Cleveland and Akron in Ohio.

Even though all of the parks come under the mandate of the Act of August 25, 1916, establishing the National Park Service, it is clear that the purpose and intent of each is not the same as the others. Clearly, we cannot manage the Mall in Washington, D.C., as we do Yellowstone National Park; nor can we manage Independence National Historical Park in Philadelphia as we do the Lake Mead National Recreation Area. In 1964 we recognized three management categories—natural, historic, and recreational—to encompass this diversity. These are valid for some parks in each category, but others have characteristics of two, or all three categories. Accordingly, we are laying greater stress on land classification within the parks so that resources may be appropriately identified and managed in terms of their inherent values and appropriate uses.

Many of the policies in this book are specific to one of the four land classification zones described in Chapter II. Chapter VI is devoted entirely to one subzone—Wilderness and Wilderness Study Areas—and Chapter V applies almost entirely to the historic zones. Additional guidelines can be prepared during planning for each park to provide management guidance for other subzones. This approach of tying policy to management of specific land classifications within park areas requires managers to manage park resources in accordance with the land classification system.

Finally, we must reserve to the planning process—involving full NEPA compliance and public involvement—a host of decisions as to how our policies are carried out in any particular park. In the planning and management of all parks, however, we must be guided by the unifying management principle that protection of ecological health and historic integrity is our first consideration and priority; that these resources are conserved for the benefit and inspiration of the people through the understanding, appreciation and enjoyment of the values being preserved. Thus, park uses shall be limited to those activities which are dependent upon and protective of the natural and historic values each park was established to preserve. Furthermore, the level, frequency and duration of permitted uses shall be limited where necessary to protect park resources from alteration or loss.

In carrying out this principle, the Service will afford the public the opportunity to participate effectively in significant planning and management decisions for individual parks and the National Park System as a whole. Such public involvement will extend to the development, revision and implementation of plans, programs, policies, standards and regulations.

We recognize that new policy guidance may be required which we did not foresee, and, certainly, we will need to issue directives and instructions on policy interpretation and compliance in many cases. For these reasons, the policies are printed in looseleaf form, and we will conduct periodic reviews to update this book.

These revised policies have had broad input from the Congress, Federal agencies, conservation organizations, and interested parties, as well as from within the National Park Service. This is important because the parks are public properties. Not surprisingly, we have a far better document because of these contributions, and I would like to thank all of those who have helped us in this endeavor.

This document is most important for the guidance it will give to the management of

the National Park System. Park superintendents, and others concerned with parks, are confronted regularly with questions that require consistent policy guidance. Such guidance must be clear and unambiguous; yet, it must be flexible enough to apply to the park's particular needs of resource protection and use. This, of course, is what these policies are all about—perpetuation and protection of the Nation's natural, historic, and recreational resources, and the provision for their enjoyment by the public in such manner and by such means as will leave them unimpaired for future generations.

/s/ Gary Everhardt

CHAPTER III

DEVELOPMENT

Management Policies of the
National Park Service
United States Department of the Interior

## CONTENTS

| | Page |
|---|---|
| Park Access and Circulation | 1 |
| Automobile Road System | 1 |
| Parking Areas | 2 |
| Non-Park Roads | 2 |
| Public Transportation Systems | 2 |
| Operation of Public Transportation Systems | 3 |
| Coordinating Transportation Systems | 3 |
| Interpretation for Public Transportation Systems | 3 |
| Trails and Walks | 3 |
| Hiking Trails | 4 |
| Horse Trails | 4 |
| Bicycle Trails | 4 |
| Interpretive Trails | 4 |
| Cooperative Trail Planning | 4 |
| Backcountry Trails | 4 |
| Trail Bridges | 5 |
| Design and Construction Considerations | 5 |
| Design and Quality Control | 5 |
| Environmental Technology | 5 |
| Contruction | 6 |
| Borrow Pits | 6 |
| Utilities | 7 |
| Facilities for the Handicapped | 7 |
| Visitor Facilities | 7 |
| Overnight Accommodations | 7 |
| Formal Campgrounds | 8 |
| Group Campgrounds | 8 |
| Boaters' Campgrounds | 9 |
| Backcountry Campsites | 9 |
| Hostels and Low Cost Accommodations | 9 |
| Comfort Stations | 9 |
| Interpretive Facilities | 9 |
| Visitor Centers | 10 |
| Amphitheaters | 10 |
| Wayside Exhibits and Interpretive Trails | 10 |
| Cultural Activities and Facilities | 10 |
| Management Facilities | 11 |
| Administrative Offices | 11 |
| Park Housing | 12 |
| Housing in Historic Structures | 12 |
| Trailer Villages | 12 |
| Traffic and Navigation Aids | 12 |
| Miscellaneous Management Facilities | 12 |
| Maintenance Structures | 13 |
| Memorials | 13 |
| Signs | 13 |

ii

## DEVELOPMENT

THE NATIONAL PARK SERVICE WILL PROVIDE APPROVED DEVELOPMENT NECESSARY FOR THE ENJOYMENT, RESOURCE PROTECTION, AND MANAGEMENT OF THE PARKS.

Provision of physical developments in a park must be consistent with approved plans and National Park Service policies. Physical developments are limited to those necessary to carry out the approved management objectives for each park. Provision of these facilities and their location, design and materials will be consistent with the perpetuation and protection of the resources of the parks.

Application of the criteria of effect promulgated by the Advisory Council on Historic Preservation and compliance with the Council's Procedures for the Protection of Historic and Cultural Properties (36 C.F.R. Part 800) will precede any development.

PARK ACCESS AND CIRCULATION

Commensurate with its mandate for resource protection, the National Park Ser-

i

vice will assure reasonable access to and circulation within the areas of the National Park System to provide for visitor use and enjoyment and park management. In so doing, the Service will choose methods of access and circulation having the minimum visual impact and physical and biological disturbance on the park resources.

Depending upon park size, location, resources, and degree of use, the access and circulatory system may provide a mix of use by automobile, public transportation, walks, trails, bicycles, horses, boats, aircraft, or other means. Protection of the park environment, quality of park experience, cost, and conservation of energy, will be primary determinants in choosing any particular type, or mix of types, of access and circulation. The Service will employ variety in park transportation, with emphasis, wherever reasonable, on non-motorized means.

### Automobile Road System

For most existing parks, a road system has usually already been constructed in accordance with previous policies. In updating plans for these parks, the Service will question the continued validity of the existing road system, whether the system needs to be curtailed, expanded, or supplemented by other circulatory modes. Where roads are chronically being used to capacity, the use of public transit or limitations on use must be considered as an alternative to road improvements.

### III–1

In considering the provision, expansion or upgrading of a road as a means of access, professional determinations must be made that

—access to area is necessary;

—the road is the best alternative for necessary access;

—the resulting effects on the park environment—including wildlife mobility and habitat, rare and endangered plant and animal life, archeological and his-

toric resources, drainage, stream flow, erosion, cuts and fills—will be minimal;

—the road is intimately and harmoniously related to the landscape through which it passes; and that

—it takes maximum advantage, consistent with the foregoing criteria, of interpretive and scenic values.

Based on these policy criteria, the Service will develop and keep current "Park Road Standards" to guide specific road design.

*(See Coordinated Regional Planning II–6, Historic Roads V–19, Wilderness—Roads VI–7.)*

*Parking Areas* —The placement of parking areas and overlooks where they unnecessarily intrude, by sight or sound, on significant features must be avoided. Moreover, parking areas should be limited to the smallest size appropriate to the park experience they are to serve. Where large parking areas are needed, they should be designed to soften the visual impact of the facility.

*Non-Park Roads* —Existing non-park traffic arteries are to be removed where feasible. Purposes of park roads are different from those of Federal and State systems. They are not, and should not be, continuations or connecting links in the State or Federal highway system. Commercial traffic, except for the purpose of serving park visitors, will be discontinued on roads within parks wherever feasible.

### Public Transportation Systems

The Service will provide safe public transit systems within selected parks on land or water, wherever such systems are deemed a desirable alternative to the private automobile in terms of: quality of the visitor experience; protection of the environment against further construction for roads, parking, and facilities; avoidance of automobile congestion, pollution, and noise; conservation of energy; improved interpretation; control of use; and economic feasibility. The Service will place high priority on developing public transportation systems that can operate upon existing park

roads within areas of high vehicle congestion or during periods of heavy visitor use.

### III–2

*Operation of Public Transportation Systems* —The Service may contract for or acquire necessary equipment for public transit systems and operate or contract with others for their operation. A variety of grades and types of rolling stock will be used during the early pilot years, with the ultimate goal of acquiring proper equipment for the needs of each area in meeting its purpose and objectives.

*Coordinating Transportation Systems* —The Service will work with the Department of Transportation, AMTRAK, other Federal agencies, State, local and regional planning bodies, citizen groups, and others in developing and coordinating access to and within the park for the purpose of facilitating use of the parks via public transit systems. As a means of conserving energy, the Service will work with transportation agencies and others to encourage use of public transportation to the parks wherever feasible. *(See Coordinated Regional Planning II–6.)*

*Interpretation for Public Transportation Systems* —The National Park Service may develop, either through direct employment or by contract or agreement, appropriate interpretive programs for use in conjunction with public transit systems operating within a park area. The Service will, in all instances, retain control and be responsible for supervision over the program content, quality, and methods. *(See Interpretive Services VII–3.)*

*Trails and Walks*

Trails and walks will be planned and provided as an integral part of the park access and circulation system. Most park lands are at present accessible only by trail and with the passage of wilderness legislation for various parks, approximately half of the acreage of the System will be legally restricted to non-motorized access. Trails, like roads, should provide enjoyable access to interesting park environments without endangering fragile resources. Trail loca-

tion, design, and construction call for an interdisciplinary approach. Heavily used walking trails may be surfaced as necessary to conform with visitor safety, resource protection, and erosion conditions. However, this does not apply in backcountry or wilderness areas, where regulation of use and trail relocation would be. the desired solutions. In the interest of safety and enjoyment of the park experience and, where the level of use indicates, hiking, horse, and bicycle trails will be separate.

Trail heads and trail access points, from which trail use can begin, should be carefully tied into other elements of the park development and circulatory system to facilitate trail use and management.

### III–3

*Hiking Trails* —Since the predominant use of trails is by hikers, hiking trails should be given first consideration as serving the greatest number with the least impact on the environment.

*Horse Trails* —Horse trails may be provided where resource conditions and other circumstances indicate, but must be carefully located, designed and managed to avoid erosion and incompatibility with hikers, and to protect fragile ecosystems from unregulated use.

*Bicycle Trails* —Bike trails may be provided where the potential for use allows and where resource considerations permit. Bike lanes on or along park roads are also encouraged when it has been determined that such use can be provided with reasonable safety to bicyclists and without causing traffic congestion. Bicycles are a viable alternative to the automobile in many parks for many people, providing healthy recreation and an enjoyable, energy-conserving way to use the parks. Bicycle trails will ordinarily need some form of paving or stabilization for the safety and convenience of the user.

*Interpretive Trails* —Interpretive trails and walks are encouraged as a means of providing controlled access into interesting park environments for purposes of appreci-

ation and understanding of park values. *(See Wayside Exhibits and Interpretive Trails III–10.)*

*Cooperative Trail Planning* —The Service will cooperate with others to facilitate trail and bicycle access to parks. In the case of bicycles, various states now have, or are planning, programs for bike trails. Where parks are abutted by other public land, inter-agency trail planning is encouraged. Where an effective trail system is a reality, consideration should be given to the provision of hostels or similar low-cost overnight facilities—where permitted—to encourage bicycle and hiking use. *(See National Trail System I–2, Overnight Accommodations III–7, Hostels and Low Cost Accommodations III–9.)*

*Backcountry Trails* —Trail planning for backcountry portions of parks will serve as a management tool to help control distribution and intensity of use and avoid undesirable impacts on the environment. Trails should provide access to a representative sampling of the backcountry.

In large parks, different levels of trail construction and maintenance standards should be applied to accommodate a range of trail users. However, backcountry trails should be unsurfaced and of modest primitive character, except where permitted horse travel requires a more durable surface. No artificiality in the form of non-native materials should remain visible in a final trail product. *(See Wilderness— Trails VI–7, Backcountry Use VII–8.)*

### III–4

*Trail Bridges* —Trail bridges may be placed in backcountry areas for stream crossings involving high or swift water constituting a safety hazard or where the absence of a bridge would require crossing hazardous terrain. Bridges will be kept to the minimum in number and size to serve trail users. Bridges should be in harmony with the natural scene and natural appearing materials should be used in their construction. Construction materials will be obtained from outside park boundaries whenever possible.

## DESIGN AND CONSTRUCTION CONSIDERATIONS

### Design Quality and Control

Only those physical facilities needed for management and appropriate public use and enjoyment shall be provided in a park area, and then only at sites designated on approved plans.

Where new facilities are needed, the Service will employ quality design of a high aesthetic and functional caliber. Facilities will be integrated into the park landscape so as to cause the least adverse effect upon it.

Within small parks, or in developed areas of large parks, there will be a consistent design unity complementing the purpose, spirit and theme of an area rather than competing with or dominating park features. In historic zones, new structures erected for visitor or administrative use shall be of contemporary design but in harmony with the area and its historic resources in proportion, color, and texture. No attempt shall be made to duplicate or mimic a historic design, nor shall any modern construction be portrayed to the public as historic. Adaptive use of existing historic or nonhistoric buildings shall be considered before new facilities are constructed.

In carrying out its development programs, the Service will assure compliance with Executive Order 11752 regarding prevention, control and abatement of environmental pollution at Federal facilities.

*(See Land Classification—Historic Zone II–4.)*

### Environmental Technology

The National Park Service, as a Federal conservation agency committed to the preservation of historic and natural resources, will dedicate itself to the use of environmentally sound technology wherever structures, facilities, or systems are required for proper management and protection of the parks. Planning and design must consider energy

### III-5

requirements and work toward energy conservation and economy of construction in an environmentally sound fashion. Design should take advantage of natural climatic conditions on site and employ environmentally-neutral technology whenever reasonable cost, effectiveness, and knowledge of methods allow.

The Service will work with other Federal agencies and others involved in pioneering such technology to assure that environmentally-advanced technology is used in the parks as soon as feasible. Such technology includes, but is not restricted to, the use of solar energy for heating and cooling of structures; advanced sewage and solid waste disposal systems and techniques; use of wind energy for electrical generation; use of water power where dams or other permanent structures are not required and where the stream ecosystem is not adversely affected or altered.

*(See Administrative Offices III-11.)*

*Construction*

Construction of park facilities shall be rigidly controlled to preclude undue damage to vegetation, soils, and archeological resources through excessive grading and alteration of contours to fit developments, and to reduce air, water, and noise pollution. The Service will adhere to all applicable Federal, State and local environmental laws, standards and emission or effluent limitations. Developments will not be construed where natural environmental processes pose a persistent threat to the facility or the people using it (e.g. shoreline maturation, landslides, predictable flooding, etc.). Materials recovered from approved construction sites may be used for construction or maintenance projects within the area. If needed construction materials are not obtainable from construction sites, they may be obtained from other sites in the area only when considerations of cost and accessibility make importation of the materials impractical, and then only when it is determined that such activities will not significantly affect historic and natural resources and ecological processes. Wherev-

er practical, soils and plants should be stockpiled for use in restoring the site or other degraded park areas.

*Borrow Pits*

Only when economic factors make it totally impractical to import materials will borrow pits be created in the parks, or present pits further utilized. Furthermore, such pits, as well as spoil areas, shall be created only in park locations of altered or low resource value which are not generally viewed or used by the visitor. Such areas will be reclaimed to fit compatibly with the surrounding environment following abandonment of use.

### III-6

*Utilities*

Utility lines should be placed underground, except where such placement would cause significant damage to the natural ecological associations or the geological, historical and archeological resources of the area. When placed above ground, utility lines and appurtenant structures should be carefully planned and located to minimize their impact on park resources and visual enjoyment of the scene. Whenever possible, all utilities should be in a common corridor and combined with transportation corridors. In historic zones, utilities that were present during the historic period are historic resources and shall be governed by the same policies as for other historic resources. Where modern needs require upgraded lines and facilities, such modern utilities shall conform insofar as possible to the appearance and location of the historic utilities. *(See Wilderness—Utility Lines VI-3, Utility Services VII-13, Utility Rates VIII-6.)*

*Facilities for the Handicapped*

Accessibility to and use of park facilities by physically and mentally handicapped visitors will be provided in conformance with applicable provisions of the Design and Construction of Public Buildings to Accommodate the Physically Handicapped Act (P.L. 90-480, 82 Stat. 718), and other applicable laws and regulations.

To the greatest extent possible, commensurate with their physical limitations, the handicapped should be able to enjoy the park using the same facilities as the non-handicapped visitor. Park design will facilitate this goal. Special interpretive facilities and programs for the physically and mentally handicapped are encouraged where good potential for participation is indicated.

In providing for access to and enjoyment of historic properties by the physically handicapped, the provision of handrails or wheelchair paths may be necessary. Care shall be taken that the physical and visual effect of such facilities is minimized.

VISITOR FACILITIES

The Service will provide needed visitor facilities for the use and enjoyment of the park as identified in the general management plan and associated planning documents, commensurate with park purpose, objectives, the requirements of applicable laws, and Service policy.

*Overnight Accommodations*

The location and use of many parks is such that visitors need overnight accommodations in or near the park in order to enjoy their visit. Certain park uses, such as backcountry use, may require overnight stays.

III–7

Overnight facilities will be restricted to the kinds and minimum levels necessary to achieve park purpose consistent with the protection of park resources, and will be provided only when the private sector or other public agencies cannot adequately provide for them in the park vicinity. Overnight accommodations may vary from unimproved backcountry campsites to more substantial lodging, as appropriate. Whenever accommodations must be provided in the park by a concessioner, they will be provided in a price range that will serve the broadest spectrum of visitors. *(See Coordinated Regional Planning II–6, Compatible Use of Historic Structures V–21, Wilderness—Chalets and Concessioner*

*Camps VI–7, Camping VII–10, Private Enterprise Out-of-Park VIII–2, Concessions—Overnight Accommodations VIII–3.)*

*Formal Campgrounds*—New formal campgrounds for tents and recreation vehicles may be provided in parks only in line with the above policy.

Campground design will be flexible. Terrain, climate, predominant method of camping and type of user, and other relevant factors will enter into the design. However, the Service will not attempt to provide the full range of technological amenities and utility hookups associated with some private campgrounds.

Campgrounds capable of attracting large recreation vehicles or buses should not be located where a park access road, otherwise capable of accommodating visitor traffic, is incapable of accommodating the camping recreation vehicles safely without upgrading of the road, or where the presence of such vehicles could cause traffic jams or threats to visitor safety.

Campgrounds will be limited to 250 sites, except where a larger number of sites is approved by the Director. Modest-sized play areas containing swings and other playground equipment for small children are permissible, as are informal areas for field sports. Provision will be made for the use of charcoal or other fuels, or of central cook sheds where necessary by reason of fire danger, air pollution, or other hazards, or to restrict the use of wood for fires at individual campsites. Where desirable for purposes of management, tent camping may be provided in separate campgrounds or in separately designated areas within campgrounds. Sanitary dump stations will be provided at Class A campgrounds accommodating recreation vehicles.

*(See Camping VII–10.)*

*Group Campgrounds*—Provision may be made for accommodating organized camping groups in separate campgrounds or in campsites adjacent to, but separated from, individual sites within formal campgrounds.

### III–8

*Boaters' Campgrounds* —In parks with water areas subject to recreational boating, boaters' campgrounds may be provided. The nature of the body of water (river, lake, reservoir, salt water, etc.); the capacity of the environment to accept the use without adverse effects on the resource; the feasibility of providing and maintaining docking, beaching, mooring, camping, and sanitary facilities; and legal and policy considerations will determine the size, location, and number of planned campgrounds. Where facilities cannot be provided, or circumstances warrant, boating use may be regulated.

*Backcountry Campsites* —Backcountry and wilderness campsites may be provided to permit, but not exceed, acceptable limits of use determined for each park in the resources management plan. *(See Wilderness—Overnight Use VI-4, Backcountry Use VII-8.)*

*Hostels and Low Cost Accommodations* —Where appropriate to the planned use of a given park, the Service supports the provision of hostels and other low-cost accommodations for the use of visitors—particularly for younger people and those of limited means. Such facilities, utilizing existing or new park structures may be provided and operated by others under agreements with the Service when available for use by the general public. They may also be supplied by park concessioners or, if necessary, by the Service. *(See Cooperative Trail Planning III-4.)*

*Comfort Stations*

Where adequate water supplies exist, and where the level of use requires waste disposal systems, comfort facilities should be equipped with flush toilets and easily cleaned sanitary floor and wall surfaces. Showers may be provided in comfort stations serving overnight visitors only when there are no alternative shower or bathing facilities reasonably available. Chemical toilets in portable enclosures may be used where necessary, and pit privies, vault toilets, or other alternatives which meet public health standards may suffice in little used areas where utility services are not readily available. *(See Wilderness—Toilets VI-8, Backcountry Sanitation VII-9, Backcountry Camping VII-9.)*

*Interpretive Facilities*

The Service will provide facilities for informational, interpretive, and visitor use programs in order to help the visitor appreciate and enjoy the park and understand its significance. Innovation and experimentation are encouraged in park interpretive and visitor use programs, and facilities not listed below may be provided for such programs where they are not inconsistent with policy, park purpose, and objectives. *(See Facilities for the Handicapped III-7, Information and Interpretation VII-2.)*

### III–9

*Visitor Centers* —To provide information on visitor use activities, for interpretation and for certain administrative functions, visitor centers of similar facilities may be located at locations identified on approved plans. Audiovisual programs, publications, staffed and self-help facilities, and museums may be included as appropriate. Such facilities must not be a substitute for onsite interpretation. Accordingly, new visitor centers will be constructed only when it has been determined by approved planning procedures that indoor media are the most effective means of communicating elements of the park interpretive story.

Historic structures may be used for visitor centers when compatible with their preservation, park purpose, and management. Consistent with policies on treatment and use of historic structures, adaptive use of structures of Second and Third Orders of Significance for visitor centers is ordinarily preferable to the development of modern facilities and the corresponding burden of preserving historic structures not open for visitation.

*(See Orders of Significance V-3.)*

*Amphitheaters* —Amphitheaters may be provided at campgrounds and other locations where the provision of formal interpretive programs is desirable. Campfire

circles may be provided in campgrounds for a variety of evening programs and to encourage informal social gatherings.

*Wayside Exhibits and Interpretive Trails* —Wayside exhibits may be provided along roads and heavily-used walks and trails to interpret park resources on site. Waysides will be designed and located to create a minimum visual impact upon the natural or historic scene. Self-guiding trails may be provided where do-it-yourself interpretation of natural and historic themes is desirable. *(See Interpretive Trails III–4.)*

*Cultural Activities and Facilities*

The National Park Service does not support the establishment of further units of the National Park System specifically for the performing arts. However, various cultural facilities and events (concerts, plays, etc.) do occur in the parks, particularly National Capital Parks. Cultural productions and programs are permissible. These may include but need not be limited to musical productions, films, lectures, plays, crafts (modern and traditional), and art exhibits. Artist-in-the-park programs are encouraged, as are other activities designed to give perspectives on the parks through the arts. In natural and historical areas, cultural productions and other cultural activities must be relevant to the history and culture of each park.

III–10

Permanent facilities should be built specifically for cultural activities in units of the National Park System only when all of the following criteria are met.

—It is impossible or impractical to use demountable or temporary facilities.

—It is impossible to adapt the activities to other park facilities not provided expressly for this purpose.

—The permanent facility is required for programs of primary importance in conveying the park story.

—Neither the construction of the facility nor its operation impairs historic or natural resources or hinders the use of the park for its intended purpose.

—The facility cannot feasibly be provided by others adjacent to, or out of, the park.

*(See Proposal Formulation Affecting Historic Resources V–11, Compatible Use of Historic Structures V–21, Living History VII–3, Special Events and Uses of Government-Owned Property VII–14, Motion Picture and Still Photography VII–15, Public Assembly VII–17, Conventions VIII–5.)*

MANAGEMENT FACILITIES

Management facilities, commensurate with law and administrative directives, should be located where best suited for the particular management function to be served, except that such facilities shall not be located where they interfere with the visitor's appreciation of the historic and natural features of the park. Where consistent with effective management, management facilities should be located out of, or adjacent to, park boundaries. *(See Environmental Technology III–5.)*

*Administrative Offices.*

Location of administrative offices will be predicated upon conditions peculiar to each park. In locating such offices, consideration will be given to the effect on the park environment, adequacy of lease space in adjacent communities, relationship to the affairs of adjacent communities, convenience to visitors, climatic and environmental conditions in the park, cost differential of providing such facilities in or out of the park, energy considerations, commuting distance for employees, considerations of management effectiveness, and related factors.

III–11

Historic structures may be used for administrative offices where such use does not deprive the visitor of the appreciation and understanding of historic values or have an adverse effect on the historic resource.

*Park Housing*

Provisions of permanent or seasonal residences for service or concessioner employees shall be permitted only in accordance with Bureau of the Budget Policy (OMB) Circular No. A–18, October 18, 1957. Where Service and concessioner employee housing is provided in a park, it will be located and designed to minimize impacts on park values by careful selection of low resource value sites, by clustering, and as appropriate, by construction of multi-family units. Service and concessioner housing, if not mixed, should be kept adjacent or otherwise carefully planned to prevent sprawl. The use of modular, pre-cut, or prefabricated housing is encouraged, but must comply with requirements of quality design. A standard plan shall not be used without professional consideration of regional design and construction influences.

*Housing In Historic Structures* —Historic houses may be made available for park housing when such use is compatible with their preservation, park purpose, and the park management program. When consistent with the policies on treatment and use of historic structures, adaptive use of structures of Second and Third Order Significance for residential use is ordinarily preferable to the development of modern housing and the corresponding burden of preserving historic structures not open for exhibition. *(See Orders of Significance V–3.)*

*Trailer Villages* —Trailer villages for concession or Service employees are discouraged. Where concessioner trailer villages presently occur in a park, contracts or supplemental agreements should control and specify conditions under which long-term occupancy may be permitted. Any future concessioner employee trailer village—determined to be necessary in a park—may be provided only for transient occupancy.

*Traffic and Navigation Aids*

Needed navigation aids should be planned in collaboration with the U.S. Coast Guard and must be installed and used in conformity with the standards established by that agency, jointly modified as necessary to meet specific park needs. Traffic signs and pavement markings shall conform to good traffic engineering practices and should be installed and used in conformity with the "Manual on Uniform Traffic Control Devices," and "National Park Service Sign Systems Specifications."

*Miscellaneous Management Facilities*

Installations such as fire towers, weather monitors, research stations, communication towers, pump houses, etc., shall be located and designed

### III–12

with equal concern for site and visual appearance. Wherever possible and efficient, such installations shall be located within, and made part of, other park developments to reduce sprawl. *(See Wilderness— Management Facilities VI–6.)*

*Maintenance Structures*

Maintenance structures shall be designed to the same quality as that of visitor facilities if they are necessarily located within sight of visitor use areas, along a main park access road, or otherwise unscreened or removed from public use areas.

Prefabricated or unitized construction systems will be used only if form, color, and design are carefully considered and adjusted as required to conform—insofar as possible—with the general architectural character of other park structures.

Historic structures may be used for maintenance purposes when compatible with their preservation, park purpose, and the park management program. Consistent with policies on treatment and use of historic structures, adaptive use of structures of Second and Third Order Significance for maintenance facilities is ordinarily preferable to the development of modern facilities and the corresponding burden of preserving historic structures not open for preservation.

*(See Orders of Significance V–13.)*

## MEMORIALS

Congress has authorized the placing of monuments at certain battlefield sites by States whose units were involved in the

engagements that the parks commemorate. Legislation relating to certain other parks contains similar provisions. In general, monuments or plaques of a memorial nature commemorating individuals or events may be erected in a park, or physical features therein may be named for individuals, when the association between the area and the individual or event is of transcendent importance. Except for existing memorializations, generally individuals should not be so honored until 20 years have elapsed since their death.

Memorials that would be aesthetically intrusive or that would adversely affect historic or natural resources are not permitted.

*(See Wilderness—Plaques, Memorials and Burial Plots VI-7.)*

SIGNS

Signs of all types should be held to the minimum number, size, and wording required to serve their intended function without loss of

III-13

scale or readability. Signs, as applicable, shall conform to the graphic standard system as described in "National Park Service Sign System Specifications." Entrance signs should be distinctively designed to suit the park at hand. *(See Wilderness—Signs and Markers VI-7.)*

III-14