**Glen E. ZUMWALT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 87–1375–C.

United States District Court, D. Kansas.

May 16, 1989.

Andrew W. Hutton, Michaud & Hutton, Wichiat, Kan., for plaintiff.

Stephen K. Lester, Asst. U.S. Atty., Wichiat, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion for summary judgment brought by defendant United States of America (Government). Plaintiff brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, to recover for his personal injuries sustained when he fell while visiting Pinnacles National Monument in California. The government contends the court lacks subject matter jurisdiction of the case as the alleged negligent acts of the National Park Service (NPS) fall within the discretionary function exception of the FTCA.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2511–2512.

An issue of fact is "genuine" if the evidence is sufficient—significantly probative or more than merely colorable—for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact involves "material" facts when proof thereof might affect the outcome of the lawsuit as determined by the controlling substantive law. *Id.* 477 U.S. at 249, 106 S.Ct. at 2510–2511. Where there is but one reasonable conclusion as to the verdict and reasonable minds would not differ as to the import of the evidence, summary judgment is appropriate. 477 U.S. at 250, 106 S.Ct. at 2511.

The movant's burden under Fed.R.Civ.P. 56 is to make an initial showing of the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 345. (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of "the pleadings, depositions, answers to in-

terrogatories and admissions on file, together with affidavits if any," which demonstrate the absence of a genuine issue of fact. *Id.* Fed.R.Civ.P. 56(c). "[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden." *Windon*, 805 F.2d at 345 n. 7. The movant, however, does not have the burden to prove a negative, that is, to disprove the nonmoving party's evidence. *Id.* at 346. Nor do the claims need be proven false; the movant must only establish that the factual allegations are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in 56(c). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. These facts must demonstrate a genuine issue remaining for trial and not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." (citation omitted.) *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed. 2d 265 (1986).

For purposes of this motion, the following facts are uncontroverted.

1. Pinnacles National Monument (Monument) is located on 16,000 acres of land approximately 90 miles south of San Francisco Bay. Around 200,000 people visit the Monument each year.

2. The rock pinnacles, for which the Monument is named, are remnants of a volcano that erupted 23 million years ago. Within the Monument are Talus caves formed by large boulders that have fallen into a narrow canyon.

3. The Monument is operated by the NPS and has been designated as a wilderness area under the Wilderness Act, 16 U.S.C. § 1131 *et seq.*

4. A two-mile segment of the Monument's 35 miles of trails is called the Balconies Trail which passes through the Balconies Caves. Along the trail are twenty markers which are only numbers that correspond to a point of scenic interest described in a NPS pamphlet "The Balconies Self–Guiding Trail." The pamphlet also warns about the special attention needed in the cave section of the trail. [The evidence of record does not show whether or not plaintiff and his family obtained a copy of the pamphlet before the accident or even if the pamphlet was available to them on the day of the accident.]

5. The plaintiff, his wife and two sons arrived at the Monument around 5:00 p.m. on July 10, 1985. They intended to find a view described in a tourist guide where one could see beyond the coastal range to the San Joaquin Valley and high Sierras.

6. While hiking along the Balconies trail, plaintiff and his family at some point became uncertain as to what way the trail continued. Seeing footprints to his left, plaintiff went ahead of his family to check out this possible route. Plaintiff called back to his family to come ahead as this way appeared fine. While waiting for his family to catch up, plaintiff looked around and saw a large shadowed area a few steps to his right. Wondering if it was the cave or just an alcove, plaintiff reached and stepped into the shadowed area and fell when his foot slid on the gravel. Plaintiff was severely and permanently injured in this tragic accident.

7. Plaintiff fell near Marker 13. Except for the numbered markers and signs at the cave entrance indicating the need for flashlights, the trail is not otherwise marked.

8. After plaintiff's fall, the Safety Committee at Monument recommended to the superintendent that hand rails be installed along the trail near Marker 13. The Safety

Committee's minutes from three meetings reflect:

*September 30, 1985*

"New Business:

\* \* \* \* \* \*

4. Balconies Cave Railings (Clarence) Once railing is in place. The other needs welding. There is one place where the rock steps are small and this rail would span a dropoff—it will require careful engineering to avoid being a hazard in itself. The committee will have the next safety meeting on the westside and will observe this problem."

*October 28, 1985*

"Old Business:

\* \* \* \* \* \*

The safety committee decided to have the left hand railing eliminated leading up the stairs on the Balconies Caves and to install two short directional railings along the left approach to the stairs. Rocks will be placed to prevent hikers from going off trail at the base of the right hand railing. Clarence will write a report on this for the Superintendent's approval."

*November 25, 1988*

"Old Business:

\* \* \* \* \* \*

*Balconies Cave* Supt. has given written approval of the committee's recommendation to use a right directional railing on the stairs. The left approach railing still needs to be split into short sections. The opening at the base of the right railing has been blocked with rocks."

9. Pursuant to the Wilderness Act, the Secretary of Interior has promulgated regulations and established management policies on wilderness preservation and management.

10. In 1983, the Superintendent of the Monument adopted a revised "Natural and Cultural Resources Management Plan" to guide park managers in achieving the resources management goals and objectives expressed in earlier plans. The 1983 Plan addresses the problem of trail maintenance through the Balconies Caves, discusses the available alternatives, and concludes that actions would be held to a minimum "using native material and concrete for those sections of the trail that have proven to be hazardous or difficult to follow."

The United States may not be sued without its consent or waiver of sovereign immunity. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1975–1976, 48 L.Ed.2d 390 (1976); *Shaw v. United States*, 854 F.2d 360, 361 (10th Cir.1988). "[I]n sweeping language," the FTCA waives sovereign immunity. *United States v. Yellow Cab Co.*, 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951). The FTCA allows suits against the Government for tortious conduct by governmental employees who are acting within the scope of their office, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). *Accord, Shaw*, 854 F.2d at 361. The waiver of immunity is limited by exceptions found within the FTCA, these exceptions are to be narrowly construed. *Miller v. United States*, 710 F.2d 656, 662 (10th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983).

■ Codified at 28 U.S.C. § 2680(a) and called "[p]erhaps the most significant limitation" to the FTCA's waiver of immunity, *Bowman v. United States*, 820 F.2d 1393, 1394 (4th Cir.1987), the discretionary function exception provides:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

This exception has been a frequent issue of litigation in recent decades. *Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1499 (9th Cir.1989). The discre-

tionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–2762, 81 L.Ed.2d 660 (1984). Procedurally, the discretionary function exception is a " 'jurisdictional prerequisite to suit' " and is part of plaintiffs' burden to establish subject matter jurisdiction. *Miller*, 710 F.2d at 662, (quoting *Baird v. United States*, 653 F.2d 437, 440 (10th Cir.1981)).

In a line of decisions, highlighted by three in particular, the Supreme Court has struggled with this exception in an effort to apply it consistent with congressional intent. *Berkovitz v. United States*, — U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); and *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Varig Airlines*, the Supreme Court admitted its reading of the FTCA had "not followed a straight line," and noted that it was impossible "to define with precision every contour of the discretionary function exception." 467 U.S. at 811, 813, 104 S.Ct. at 2764.

The first decision to carefully examine the discretionary function exception, *Dalehite*, involved the explosion of a fertilizer which had been produced and stored for eventual distribution under the direction of the United States as part of a program after World War II. The alleged negligent acts included the decision to institute the program, the failure to experiment, the design plan for manufacturing, and the failure to monitor storage and loading of the fertilizer. The Supreme Court found these allegedly negligent acts were protected by the discretionary function exception in § 2680(a). The Court stated:

It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It

also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.

346 U.S. at 35–36, 73 S.Ct. at 967–968. The expansive language in *Dalehite* essentially erected a case-by-case approach to the discretionary function exception.

■ The Supreme Court clarified some of the concepts behind this exception in *Varig Airlines*. The Court considered negligence claims against the Federal Aviation Administration (FAA) in establishing and performing procedures for spot checking certain airplanes' compliance with air safety regulations. Backing away from some of the expansive language in *Dalehite*, the Court focused on the policy-making nature of actions and decisions protected by the discretionary function exception. The Court found:

The FAA's implementation of a mechanism for compliance review is plainly discretionary activity of the "nature and quality" protected by § 2680(a). When an agency determines the extent to which it will supervise safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding. Here, the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policy-

making that the discretionary function exception was designed to prevent.

It follows that the acts of FAA employees in executing the "spot-check" program in accordance with agency directives are protected by the discretionary function exception as well. See *Dalehite v. United States,* 346 U.S. at 36, 97 L.Ed. 1427, 73 S.Ct. 956 [at 968]. 467 U.S. at 819–820, 104 S.Ct. at 2767–2768. In applying the discretionary function exception, it is the nature of the conduct, instead of the status of the government agent, which controls. 467 U.S. at 813, 104 S.Ct. at 2764. The choice or discretion exercised must be of the kind that Congress designed to shield with this exception. 467 U.S. at 813–14, 104 S.Ct. at 2764–2765. These principles are further refined and amplified in *Berkovitz.*

█ Last term, the Supreme Court heard claims that the Division of Biologic Standards had wrongfully licensed a vaccine and wrongfully approved release of a lot of vaccine from which plaintiff, Kevan Berkovitz, had contracted severe polio. The Court enunciated a two-step process for assessing whether the discretionary function applies. First, the nature of the challenged conduct is examined to determine whether the government employee had any discretion or choice in his actions. The Court explained:

> Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretionary function exception to protect. Cf. *Westfall v. Erwin,* 484 U.S. 292, ——. 98 L.Ed.2d 619, 108 S.Ct. 580 (1988) (recognizing that conduct cannot be discretionary if prescribed by law).

*Berkovitz,* —— U.S. at ——; 108 S.Ct. at 1958–1959, 100 L.Ed.2d at 540–541. Without an element of choice or discretion, the worker's actions are not shielded.

The second step is concerned with the particular nature of the discretion, and the court must determine whether it is the kind that Congress designed the exception to protect. *Berkovitz,* —— U.S. at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541. As stated in *Varig Airlines,* Congress wished to prevent tort actions from becoming an opportunity for the courts to second guess governmental decisions "grounded in social, economic and political policy." 467 U.S. at 814, 104 S.Ct. at 2764–2765. "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz,* —— U.S. at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541.

In *Berkovitz,* the Court held that the issuance of a license to a vaccine manufacturer without receiving regulatorily required test data or without determining whether the vaccine complied with regulatory standards were not discretionary acts under the agency's own policies. The Court declined to decide, on the basis of an inadequate record, whether an agency's determination that the vaccine complied with regulatory standards involved the exercise of policy judgment or merely the application of objective scientific standards. As to the alleged negligent release of the vaccine lots, the Court held the agency's formulation of a regulatory scheme was protected under the discretionary function. —— U.S. at ——, 108 S.Ct. at 1963–1964, 100 L.Ed.2d at 546–547. The individual official's implementation of the scheme was protected only if the official had room to make independent policy judgments. As plaintiffs had alleged that the regulatory scheme allowed no independent policy judgment by the implementing officials, the Court found that plaintiff's claims should not have been dismissed. —— U.S. at ——, 108 S.Ct. at 1964–1965, 100 L.Ed.2d at 547–548.

█ In the present case, plaintiff alleges the defendant negligently maintained, managed, controlled, operated and inspected the Monument in the following ways:

1. Failure to warn plaintiff of the potential hazard of mistaking the trail or pathway.

2. Using a ground surface on the correct path of the trail that appeared to be the same color and texture as the rest of the ground surface, making it impossible for plaintiff to ascertain the correct and safe course of the trail.

3. Failing to use barriers, rails, signs, warnings or any other devices that would have precluded plaintiff from inadvertently venturing into a hazardous area.

4. Failure to have adequate employees on the premises of Pinnacles National Monument to safely direct and guide patrons to the proper path or trails.

5. Failure to properly inspect the premises and take action to correct potential hazardous conditions prior to injuries occurring.

(Pretrial Order, Dk. #24). The Government contends these alleged actions involve the exercise of discretion and demand a policy judgment made from balancing the often competing interests of public safety and the preservation of a wilderness area. Plaintiff maintains the only policy judgments involved are embodied in the Plan and the NPS has negligently failed to carry out that express policy. Defendant argues its actions violated no statute, regulations, policy or other directive.

The mission of the NPS is set forth at 16 U.S.C. § 1, which provides in pertinent part:

The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

By statute and regulation, the NPS has been conferred the broad discretion to promote and regulate the parks and monuments so as to preserve the natural scenery and wildlife for the present and future generations.

In 1976, Congress designated Pinnacles Monument a wilderness area, which is defined by statute as:

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c). Congress also called upon the respective agencies to administer wilderness areas in a manner which would preserve their "wilderness character." 16 U.S.C. § 1133(b).

As a guide for achieving its responsibilities, the NPS issued "Management Policies" and a copy of those issued in 1978 have been provided to the court. In broad, general terms, the Management Policies describes wilderness use such as information available to visitors, overnight use, and commercial services. The Policies also recognize:

The visitor must accept wilderness largely on its own terms. Modern conveniences are not provided for the comfort of the visitor; and the risks of wilderness travel, of possible dangers from ac-

cidents, wildlife, and natural phenomena must be accepted as part of the wilderness experience. (VI–4).

Among the information to be made available to visitors, the Policy specified those "special dangers of wilderness use and precautions to be observed by the user." (VI–5).

The Management Policies also outline basic concepts of wilderness management including the "minimum tool" policy, which is:

> In the management of wilderness resources and of wilderness use, the service will use the minimum tool necessary to successfully, safely and economically accomplish its management objectives. When establishing the minimum tool, economic factors should be considered the least important of the three criteria. The chosen tool or equipment should be the one that least degrades wilderness values temporarily or permanently. (VI–6, 7).

Consistent with this goal, the Management Policies allow for the placement of signs "where they are necessary for visitor safety, management, or resource protection." (VI–9).

As earlier stated, the Superintendent of Pinnacles Monument adopted a Management Plan in 1983 (1983 Plan). Included in the 1983 Plan was a project statement on improving the Balconies Cave Trail. It identified the problem of visitor injuries in those places where turns were missed and the visitors later suffered falls. The statement summarized current efforts to reduce injuries as additional warnings on signs and in park brochures, but that "injury and complaint levels are still unacceptably high." Alternative actions were discussed including a paved trail, additional lighting, no action, closing the cave, and upgrading hazardous portions of the trail. The action recommended was:

> Since the cave is in a wilderness area, management actions will be held to a minimum. Visitor safety will be improved by using native material and concrete for those sections of the trail that

have proven to be hazardous or difficult to follow.

In its discussion of the recommended alternative, the project statement included the following remark: "[T]he location and type of improvements will be dictated by wilderness policy and the need to provide for public safety."

Plaintiff has also submitted minutes from Monument's Safety Committee meetings. The procedure revealed therein was the Committee's recommendation of certain action to the superintendent for final approval before any measures were taken.

This overview of the NPS and its administration of Pinnacles Monument clearly demonstrates the exercise of policy judgments in each of defendants' actions which plaintiff has alleged as negligence. The need for additional warnings, permanent trails, additional personnel, or barriers were explicitly or implicitly considered in developing the project statement discussed above. The project statement itself shows the Superintendent's balancing of such policy factors as the preservation of the wilderness character and visitor safety. This statement also indicates that the recommended action of further improvements of hazardous portions of the trail involved the exercise of additional discretion as to need and type. The project statement does not specifically identify what portions of the trail are hazardous, and nor does it define what constitutes hazardous. These matters were left to the discretion of the safety committee to evaluate considering the overriding goal of maintaining a wilderness area, the minimum tool policy, the visitor's acceptance of the wilderness on its own terms, and visitor safety. For the court to exercise jurisdiction in this case would necessitate the type of judicial "second-guessing" of policy judgments that Congress designed the discretionary function exception to prevent.

Both the 1983 Plan and the project statement undeniably give park personnel the room to exercise individual judgment and to balance the relevant policy factors in suggesting and carrying out safety improvements. In not making prior improve-

ments to the trail where plaintiff was injured, the Safety Committee and park personnel ostensibly had not identified that portion of the trail to be so hazardous as to require altering the wilderness character of the trail. The prior accident reports submitted by the plaintiffs do not establish that this portion of the trail was necessarily "hazardous." Even assuming the plaintiff had succeeded in proving this, plaintiff would still have to show that the NPS *failed to perform* a responsibility imposed by policy or regulation which did not involve the exercise of individual policy judgment. Plaintiff's claims and evidence do not reach this threshold.

The court finds its conclusion to be consistent with a number of decisions from other jurisdictions. *ARA Leisure Services v. United States,* 831 F.2d 193 (9th Cir. 1987) (NPS' decision to construct park road without guardrails was protected but not its failure to maintain the roads to park standards); *Bowman v. United States,* 820 F.2d 1393, 1395 (4th Cir.1987) (NPS' failure to erect guardrails or warning signs of road dangers involved policy judgment requiring the balancing of "safety, aesthetics, environmental impact and available financial resources."); *Flynn v. United States,* 681 F.Supp. 1500 (D.Utah 1988) (No fixed or readily ascertainable standard for NPS employees in particular use of emergency vehicle.); *Schieler v. United States,* 642 F.Supp. 1310 (E.D.Cal.1986) (Discretionary function exception applied to claim of NPS' failure to warn park visitor of lightning strikes or to maintain or provide safety devices.); *Boyd v. U.S. Ex Rel. U.S. Army Corps of Engineers,* 631 F.Supp. 814 (E.D.Okl.1986) (Failure to warn of hazardous area for swimming in a lake under the control of the Corps of Engineers was shielded by discretionary function exception.).

An earlier Tenth Circuit decision has allowed a claim, despite the discretionary function exception, based upon the NPS failure to post warning signs of thermal pools in an undeveloped portion of Yellowstone National Park. *Smith v. United States,* 546 F.2d 872 (10th Cir.1976). This court questions whether this decision has

continuing precedential authority because of later case law. For example, the court in *Smith* essentially discounted the significance of any policy judgments made by individual park rangers. The Supreme Court has since shielded the Government from liability for the individual policy judgments of FAA employees conducting compliance reviews of aircraft. *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. at 2767–2768. After *Smith,* the Tenth Circuit has also backed away from the proposition that the need to give warnings is not within the discretionary function exception. *Miller v. United States,* 710 F.2d 656 (10th Cir.1983) (Failure to warn of dangerous road conditions not an actionable claim under FTCA). In the present case, the record is replete with proof that NPS' alleged negligent acts involved the exercise of policy judgments.

IT IS THEREFORE ORDERED that the Government's motion for summary judgment is granted.