Robert CHILDERS and Mary Beth Childers, individually; and Robert Childers and Mary Beth Childers, as Personal Representatives of the Estate of David Childers, deceased; and Robert Childers and Mary Beth Childers, Guardians Ad Litem for Luke Childers and Christa Childers, Minors, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV 92–39–BLG–JDS.

United States District Court,
D. Montana,
Billings Division.

July 2, 1993.

Robert L. Jovick, Jovick Law Office, Livingston, MT, for plaintiffs.

Doris M. Poppler, Office of the U.S. Atty., Billings, MT, Rupert M. Mitsch, U.S. Dept. of Justice, Torts Branch, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

SHANSTROM, District Judge.

### FINDINGS OF FACT

1. The Childers family brought a negligence action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671–2680, for injuries resulting from the death of their son in a winter hiking accident in Yellowstone National Park ("Yellowstone" or "Park"). The gravamen of the lawsuit is the alleged failure of the National Park Service ("NPS" or "Park Service") to close the trail where the accident occurred. Since the death occurred in Wyoming, the law of that state applies. 28 U.S.C. § 1346(b).

2. On the morning of February 25, 1990, the Magone and Childers families entered Yellowstone through the North Entrance. (Testimony of Mrs. Childers; deposition of Mary Childers at 17)

3. The families, longtime residents of Montana, traveled in two cars. (Testimony of James Magone; deposition of Mr. Magone at 26, 28) David Childers was a passenger in the vehicle driven by Mr. Magone. (Testimony of Mr. Magone; deposition of Mr. Magone at 26)

4. The Childers did not pay an entrance fee. (Testimony of Mrs. Childers; deposition of Mrs. Childers at 18)

5. David Childers would not have had to pay an entrance charge in any event because, pursuant to Park Service regulations, children under 16 enter the Park free of charge. 36 C.F.R. § 73.13(g). (Testimony of Bruce Hronek, plaintiffs' expert)

6. Both families rode snowmobiles from Mammoth Hot Springs to the Canyon area that morning. (Testimony of Mrs. Childers; deposition of Mrs. Childers at 18)

7. The Canyon area (Canyon subdistrict) is part of the Lake District of Yellowstone Park. Yellowstone has four districts, Lake, North, West and Snake River. The terms "Canyon", "Canyon subdistrict" and "Canyon area" are used interchangeably. (Testimony of John Lounsbury, Lake District Ranger)

8. After arriving at the Canyon Warming Hut, the families remained either in the building or in the nearby area for approximately one hour. (Testimony of Mrs. Childers; deposition of Mr. Childers at 16)

9. Sometime after their arrival at the warming hut, Mr. Magone and Mr. Childers rode their snowmobiles to the Fishing Bridge area to purchase gasoline. (Testimony of Mr. Childers; Deposition of Mrs. Childers at 25)

10. The Canyon Warming Hut is located near the beginning of the North Rim snowmobile trail. This hut contained a map hung on the wall which illustrated the five recommended overlooks in the Canyon area. (Testimony of John Lounsbury and Mark McCutcheon)

11. The Park Service advertises only five overlooks in the Canyon area during the winter. Park personnel remove snow, routinely inspect, and place winter warning signs along the trails leading to the recommended overlooks. (Id.)

12. Although they saw the map hung on the wall, neither the Magones nor the Childers recollect studying it. (Testimony of Mr. and Mrs. Childers and Mr. and Mrs. Magone; depositions of Mr. Magone at 11, Mrs. Magone at 21, Mr. Childers at 18, Mrs. Childers at 20).

13. The Canyon Warming Hut is staffed with rangers and other Park Service personnel who are available to provide information about visitor attractions. These representatives, including Ranger George Sechrist and Melanie Weeks, routinely directed visitors to the five maintained overlooks. If asked about the Trail to the Brink of the Lower Falls, or any of the other unmaintained trails, the rangers typically discouraged their use because these trails were not maintained and were snowpacked. Both George Sechrist and Melanie Weeks were available at the Canyon Warming Hut on February 25, 1990. (Testimony of George Sechrist, Park Service naturalist and Melanie Weeks, Park Service volunteer).

14. Neither the Childers nor the Magones inquired about the status or the condition of any trails in the Canyon area. (Testimony of Mr. and Mrs. Magone, Mr. and Mrs. Childers; depositions of Mrs. Childers at 21; Mr. Childers at 17; Mrs. Magone at 22; Mr. Magone at 12).

15. On February 25, 1990 the Canyon Warming Hut also contained copies of "Yellowstone Today." (Exhibit 506) (Testimony of G. Sechrist, M. McCutcheon, M. Weeks) Although the North Entrance gate was not manned at the time the Childers drove through it, "Yellowstone Today" was also available in the brochure box by the gate. (Deposition of Ranger Christie Kalkowski at 8–9)

16. The 1989/90 Winter Season "Yellowstone Today" warned visitors to take special precautions during winter visits to the Park, and that generally all trails were icy and snowpacked. (Exhibit 506 at 3)

17. With respect to the Canyon area, "Yellowstone Today" stated:

The Canyon and Upper Lower Falls of the Yellowstone River are seen from overlooks along the North and South Rim roads. Stop at the Canyon Warming Hut for a map of the area. *Trails and overlooks are snowpacked—use caution.* (*Id.*) (emphasis added.)

18. Neither the Childers nor the Magones recollect seeing the publication "Yellowstone Today." (Testimony of Mr. and Mrs. Childers and Mr. and Mrs. Magone; deposition of Mrs. Childers at 20; Mrs. Magone at 15).

19. The Canyon Warming Hut contained additional information about safety during winter activities in the Park. For instance, the "Yellowstone Winter Guide" recommended that visitors "[s]tay on boardwalks or maintained trails." (Exhibit 507 at back cover)

20. On February 25, 1990 the "Canyon Winter Guide" also contained a map which

illustrated the five maintained overlooks in the Canyon area. It directed visitors along the North Rim Drive to the maintained overlooks at Lookout Point and Grand View. (Exhibit 512)

21. Neither the Magones nor the Childers reviewed either the "Canyon Winter Guide" or the "Yellowstone Winter Guide." (Testimony of Mr. and Mrs. Childers and Mr. and Mrs. Magone)

22. Neither the Trail to the Brink of the Lower Falls, nor any other unmaintained trail was included in any of the winter maps or descriptions of the Canyon area. (Testimony of J. Lounsbury, Canyon Subdistrict Ranger Mark McCutcheon, and G. Sechrist)

23. The families (without Mr. Magone and Mr. Childers) rode their snowmobiles to the Lookout Point Trail after leaving the Canyon Warming Hut.

24. Less than a mile from the Canyon Warming Hut, Lookout Point was identified with a trailhead identification sign. There was also a warning sign which read, **"Winter visitation—Caution, Hazardous Footing."** (Testimony of J. Lounsbury, M. McCutcheon and G. Sechrist)

25. After hiking this maintained trail, the families had lunch on the Lookout Point observation deck. (Deposition of Mr. Childers at 24)

26. Mrs. Childers, Mrs. Magone, Luke Childers and David Magone were all able to see from the observation deck that there was snow on the observation decks at the end of the Trail to the Brink of the Lower Falls. (Testimony of Mrs. Childers, Mrs. Magone, Luke Childers, David Magone; deposition of Mrs. Magone at 36)

27. The families then proceeded to the trailhead of the Trail to the Brink of the Lower Falls (also known as the "Long Trail"). (Id.)

28. The Trail to the Brink of the Lower Falls drops sharply from the trailhead, approximately 400 feet in elevation. A series of nine switchbacks lead to two observation decks which overlook the Lower Falls of the Yellowstone River. The observation decks are on a split level platform surrounded by a guardrail. (Testimony of J. Lounsbury, M. McCutcheon)

29. A large trailhead sign allows visitors to identify the trail during the summer months. The trail is illustrated on most non-winter maps and brochures. (Id.)

30. During the winter, the trailhead identification sign and all references to the trail on winter maps or brochures are removed. (Id.)

31. Neither the trail nor the parking area are maintained or conditioned for use by visitors in the winter. (Id.)

32. The trail is rarely used during the winter by the general public. Indeed, during December, January and early February of 1990, visitors who used the trail had to forge their own trail by "post-holing." (Testimony J. Lounsbury, M. McCutcheon, G. Sechrist and M. Weeks)

33. Prior to the accident, Subdistrict Ranger McCutcheon had hiked the Trail to the Brink of the Lower Falls approximately one time each winter since 1985. On those occasions, he noted that the snow on the trail was deep, unpacked powder which was difficult to walk through. (Testimony of M. McCutcheon; deposition of Mark McCutcheon at 18, 25, and 32)

34. On the occasions he hiked to the observation decks, Subdistrict Ranger McCutcheon observed that approximately the upper half of the guardrails on both the upper and lower observation decks had been exposed. (Testimony of M. McCutcheon)

35. Between snowstorm cycles, the limited local use sometimes creates an informal, uneven, rutted trail to the observation decks. (Id.)

36. Rangers typically discouraged the use of this trail because it involved a strenuous hike, and there were more accessible viewpoints available. The trail, however, did not pose a greater safety risk than did any of the other unmaintained trails. (Id.)

37. Both offered testimony and a comparison of photographs of the Trail to the Brink of the Lower Falls taken the day after the accident indicate that it could not have been

mistaken for a maintained trail. (Id.; Testimony of Bruce Hronek, plaintiffs' expert)

38. Although the Park Service does not routinely inspect the trail, Ranger McCutcheon monitored the trial every two to three days. Approximately two to three days prior to the accident, he saw evidence that visitors had been near the trailhead, but noted that few were hiking down the trail. (Testimony of M. McCutcheon)

39. Both Mrs. Childers and Mrs. Magone understood that they were hiking down a steep trail which led to observation decks with dropoffs of several hundred feet, since they had hiked down the trail the previous summer. (Testimony of Mrs. Childers and Mrs. Magone; deposition of Mrs. Childers at 14, deposition of Mrs. Magone at 19–20)

40. Because of the inherent dangers in visiting Yellowstone, both Mr. and Mrs. Magone testified that adults should closely monitor children while on observation decks, and that children should be kept within sight at all times. (Testimony of Mr. and Mrs. Magone; deposition of Mrs. Magone at 13, 20)

41. David and Luke Childers ran ahead of the rest of the group while hiking down the Trail to the Brink of the Lower Falls, and began shortcutting the switchbacks. (Testimony of Mrs. Childers, Luke Childers; depositions of Mrs. Childers at 28, Luke Childers at 24–25) Shortcutting the switchbacks is prohibited because it is dangerous. (Testimony of J. Lounsbury, M. McCutcheon, G. Sechrist)

42. Mrs. Childers admonished the boys at one point to stop shortcutting the switchbacks, but they ignored this admonishment and continued to shortcut the switchbacks. The boys shortcutted approximately five switchbacks. (Exhibit 64; testimony of L. Childers) (Id.)

43. At the point the boys reached the observation decks, the mothers were approximately three switchbacks behind them and could not see them. (Exhibit 64; Testimony of Mrs. Childers; depositions of Mrs. Childers at 30, Mrs. Magone at 35).

44. Mrs. Childers stated that she did not believe that she was more than 100 feet behind the boys. Using the information Mrs. Childers provided in her deposition, Ranger Lounsbury testified that she was approximately 467.5 feet behind the boys when David was on the observation deck. Ranger Lounsbury had used a tape measure to calculate this distance prior to trial. (Testimony of Mrs. Childers and J. Lounsbury)

45. Sometime prior to the accident, a thick coating of ice developed on the observation deck and covered the guardrail facing the Canyon. (Testimony of J. Lounsbury, M. McCutcheon)

46. A large, steep snow drift extending between the upper and lower observation decks also developed. (Id.)

47. No witness prior to the accident had seen either the snow or the ice covering the guardrail, or the thick layer of ice on the observation decks. Because the observation decks are typically scoured by winds from the Canyon, the guardrails prior to this accident were always uncovered. There is usually powder snow with a thin crust on the decks. (Testimony of J. Lounsbury, M. McCutcheon, G. Sechrist, M. Weeks)

48. Ranger George Sechrist had hiked down the trail approximately 6 times that winter. He last hiked it about 7 to 10 days prior to the accident. (Testimony of G. Sechrist)

49. Although there was some snow on the decks on those occasions, the guardrails were not covered with snow, and there was no ice on the observation decks. (Id.)

50. In the two weeks prior to the accident, the Canyon area had received very little snow and the temperatures were relatively warm. This caused the snow base on the ground to melt from 50 to 44 inches. (Testimony of M. McCutcheon; Exhibit 108)

51. Subdistrict Ranger McCutcheon concluded that the warm temperatures and shrinking snow base would decrease the depth of the snow on the observation decks at the end of the Trail to the Brink of the Lower Falls. (Id.)

52. After reaching the end of the trail, Luke and David Childers walked out to the middle of the lower observation deck. (Testimony of Luke Childers; Exhibit 65)

53. The ice and snow were open and obvious prior to walking out onto the observation decks. (Testimony of Luke Childers, M. McCutcheon and G. Sechrist)

54. The boys then began to climb the snowdrift extending between the lower and upper observation decks. The boys appreciated that they were walking on ice at this point and that they could slip. (*Id.*) (Testimony of L. Childers)

55. After climbing approximately one half of the way to the upper observation deck on the snowdrift, both David and Luke Childers fell and slid below the point where they had originally began their climb. (Testimony of L. Childers)

56. During this slide, a piece of ice was dislodged and fell into the Canyon. (Testimony of David Magone; deposition at 41)

57. The boys righted themselves and retraced their steps up the snowdrift. The boys appreciated that they could slide over the edge at that point. (Testimony of L. Childers)

58. Moments later, after falling again, David slipped down the snowdrift and fell over the edge of the lower observation deck. (*Id.*)

59. Upon hearing Luke Childers' screams, both Mrs. Childers and Mrs. Magone ran to the observation decks. Neither mother could see David. (Testimony of Mrs. Childers; deposition at 30)

60. David Magone went to the Canyon Warming Hut to summon help.

61. The Park Service received the report at about 2:30 P.M. Park rangers subsequently summoned a helicopter from Mountain Rotors Helicopters in Jackson, Wyoming. (Exhibit 513)

62. After the helicopter arrived, Ranger Andy Fisher, an emergency medical technician, rappelled down a line from the hovering aircraft into the Canyon. He reached the fatally injured boy and loaded him into a litter. The helicopter lifted them out at about 5:30 P.M. (*Id.*)

63. A physician pronounced the boy dead shortly afterwards. (*Id.*)

64. Reports displayed that David died of traumatic injuries upon impact. (*Id.*)

65. Subdistrict Ranger Mark McCutcheon was the first to arrive at the trailhead after the initial report. He made the following observations as he hiked down the trail to the overlook:

—The parking area next to the trailhead was packed down by considerable snowmobile use with a small, narrow impacted foot trail leading toward the beginning of the trail through unpacked powder snow;

—The trail leading down to the observation decks was rutted, uneven, slippery, with a considerable number of footholds caused by people falling through the snowpack;

—There was evidence that people had recently "shortcut" the trail going directly down the fall line between the trail switchbacks;

—The trail was uncomfortable to descend. It was approximately 12 to 18 inches wide and impacted six to eight inches below the unpacked powder snow;

—The buildup of ice and snow on the observation decks was obvious before walking out onto the decks. Large portions of the guardrail on the canyon side of the lower observation deck were covered with snow and a thick, crusty ice;

—Slide marks indicated that the boy slid over a portion of the guardrail that was completely covered with snow and ice; and

—It was impossible to walk out onto the lower observation deck safely to approach the edge of the cliff to see the victim. (Testimony of M. McCutcheon; Exhibit 513)

66. Yellowstone spans over 2.2 million acres. There are approximately 97 trails (ranging over 1,200 miles) in the Park. The Canyon area alone has 18 hiking trails spanning over 130 miles. During the winter, visitors have access to virtually the entire Park. (Testimony of J. Lounsbury)

67. The vast majority of winter trails in Yellowstone are divided into two types. First, there are a small number of trails and overlooks that are actively maintained by the Park Service. This typically involves the removal of snow, the posting of winter warn-

ing signs, and routine patrols by rangers. Such trails are marked on Park Service publications and rangers recommend their use to visitors. The second major group are unmaintained trails. These trails are unsigned and are not routinely patrolled by rangers. The location of these trails are not marked in Park Service publications. (Testimony of Robert Barbee, Park Superintendent, and J. Lounsbury)

68. Visitors routinely use unmaintained trails in Yellowstone. Examples of such trails include those surrounding Old Faithful, the geyser basins in the Norris area, West Thumb, and Fountain Paint Pots. All of these trails present danger to the public if reasonable precautions are not taken. (*Id.*)

69. Plaintiffs' expert, Bruce Hronek, expressed the opinion that unmaintained winter trails which present a danger to the public must either be maintained, or must be closed. (Testimony of B. Hronek; deposition at 73–74, 38, 39–40, 64–66, 156)

70. It is not feasible for the Park Service to maintain all of the trails which are used by the public during the winter. The sheer length of the trails, snow conditions, and lack of resources make this task impossible. If the Park Service were required to do so, it would have no choice but to close the unmaintained trails. (Testimony of R. Barbee, J. Lounsbury, and M. McCutcheon).

71. All subdistricts in the Park are required to promulgate winter operations plans. These plans represent the priorities which rangers in that particular subdistrict have set for each winter season. In the Canyon Subdistrict, the priorities include the following tasks: (1) law enforcement presence, (i.e. patrolling the snowmobile routes); (2) reasonable level of emergency medical response; (3) reasonable level of structural fire response; (4) reasonable back country ski patrol; (5) completion of winter Resource Management projects (snow surveys, weather observations); and (6) completion of routine work assignments. (*Id.*; Exhibit 31)

72. The routine work assignments in the Canyon include, among other things, the daily inspection of the rim walkways in the Canyon for footing and safety hazards. The term "rim walkways" refers to the five maintained trails. (*Id.*)

73. These priorities reflect those tasks which can reasonably be completed by available staff during the winter season. If additional duties were required, tasks currently included within the Winter Operations Plan could not be completed. Consequently, it is not feasible to routinely inspect additional winter trails, given the level of staff and the physical impracticalities associated with the winter operation of the Park. (*Id.*)

74. The Park Service did not place signs warning of winter hazards along unmaintained winter trails generally, and the Trail to the Brink of the Lower Falls specifically, for the following reasons: (1) it is impractical to do so in an area as large as Yellowstone; (2) the presence of such signs would unnecessarily attract visitors to trails which they might otherwise not know about; and (3) the presence of such signs indicates to the public that the Park Service has inspected and maintains these trails. Because the Park Service cannot inspect all unmaintained winter trails which are used by the public and present dangers, the use of such signs would be inappropriate. (*Id.*)

75. In late October, 1989, Subdistrict Ranger McCutcheon recommended the closure of the Trail to the Brink of the Lower Falls for the winter to his supervisor, Lake District Ranger John Lounsbury. (Testimony of M. McCutcheon, J. Lounsbury)

76. Subdistrict Ranger McCutcheon based his recommendation upon concerns regarding resource preservation, the impracticality of maintaining the trail during the winter, and visitor safety. The visitor safety issue related to the prospect that the majority of winter visitors would be unprepared for the physical exertion necessary to hike up this trail. (*Id.*)

77. Prior to discussing this recommendation with his supervisor, Subdistrict Ranger McCutcheon placed a closed sign by the trailhead. (*Id.*)

78. Based upon his 12 years in the area, and the approximately 20 times he had hiked down the trail in the winter, District Ranger Lounsbury believed that the trail did not

pose a greater safety risk to the public than any of the other unmaintained trails in the Park. (*Id.*)

79. District Ranger Lounsbury also considered the visitor access issue in reaching his decision. He believed that the Park Service had a statutory obligation, pursuant to 16 U.S.C. § 1, to make as much of the Park accessible to the public as possible. Since the trail did not typically have risks greater than many other unmaintained trails in Yellowstone, he did not believe that it was appropriate to order its closure. Indeed, if this trail were closed because of its unmaintained status, the Park Service would logically have to close many other unmaintained trails that presented dangers to the public. (*Id.*)

80. Attempting to balance visitor access and visitor safety, District Ranger Lounsbury concluded that the best course of action was to keep the trail open, but to discourage its use. Toward that end, trailhead identification signs were removed, and the trail was not listed in any Park brochures. (*Id.*)

81. Prior to removing the closed sign from the trailhead, Subdistrict Ranger McCutcheon hiked down approximately one-half of the trail, and confirmed that there had been no visitor use of the trail that season. (Testimony of M. McCutcheon)

82. Under the provisions of 16 U.S.C. § 1, the Park Service has the responsibility to "conserve the scenery and the natural and historic objects and the wildlife" within the national parks and, at the same time, "provide for the enjoyment of the same in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations."

83. There is a balance in 16 U.S.C. § 1 between the Park Service's mandate to preserve the national parks, and its responsibility to provide public access to these lands for recreational and other purposes. This balance creates a situation in which the Park Service must exercise judgment and choice about what sorts of facilities and safety features, if any, to provide. (Testimony of R. Barbee, J. Lounsbury, R. Manning)

84. Park Service decisions about safety measures require the consideration of myriad public policy factors, including cost, feasibility, and aesthetics. (*Id.*)

85. The Park Service has issued guidelines which aid it in carrying out its mission. These include the Ranger Operating Procedure for trail closures, NPS–50–Loss Control Management Guideline, the NPS Sign Manual and the Trails Management Handbook. Because of the general nature of the information contained in those documents, and their wide application to facilities and parks with varying geography and climate, the guidelines do not instruct rangers how to act in specific situations.

86. The Yellowstone Ranger Operating Procedure ("ROP") for trail closures instructs that:

> Closing or restricting access to any area of YNP is a serious management/operational decision. *On one hand we must protect visitors and the resource from injury or damage and we must also allow maximum possible use access for the people to their Park* ... Not having an area closed, with proper signing and notification, could lead to serious death or injury to visitors/employees or could cause serious resource impact, i.e., removal of bears. *On the other hand, having an area closed that is closed because someone forgot to open it, or look at it to see if it should be open, causes a credibility problem with visitors, park management, congressmen, etc.* Do not underestimate the political sensitivity of closing or restricting access to any area of the park. However, we must protect the people and the park ... (emphasis added)

Exhibit 32(a).

87. The ROP instructs only that "an area or trail *may* be closed ... based upon the determined and preplanned need to provide human safety and/or minimize the human impact on the natural or cultural resources" (emphasis added).

88. The ROP requires the Park Service to consider many factors before it closes a trail, including visitor safety and visitor access.

89. The ROP also includes an instruction relating to the placement of signs in a closed area, which reads,

In order to effectively accomplish the purpose of the restriction, appropriate signs shall be used . . .

90. The ROP does not define "effectively" or "appropriate."

91. The decision whether to close a trail requires the exercise of judgment.

92. NPS–50, the Park Service's "Loss Control Management Program Guideline," states within its Policy Statement that the Park Service is committed to "providing a *reasonably* safe recreating environment for visitors while recognizing our mandated responsibility to protect the resources and natural processes which can be inherently dangerous to the unwary." (emphasis added) (Exhibit 50)

93. NPS–50 does not define "reasonably safe recreating environment."

94. That determination requires the exercise of judgment.

95. Chapter 16 of NPS–50 requires the Park Service to identify hazards that have the potential for injury, illness or property damage and take "all *reasonable* efforts . . . to alleviate the problem." (emphasis added) (Exhibit 50 at Chapter 16, page 1)

96. The definitions of the terms "potential for injury" and "reasonable efforts" are not provided.

97. These determinations require the exercise of judgment.

98. Chapter 19 of NPS–50 states that park brochures are a primary means of providing warnings to the public. Signs, interpretative program messages, bulletin board information and visitor center displays are other means of communicating safety messages. (Exhibit 50 at Chapter 19, page 1.2)

99. NPS–50 does not mandate which method the Park Service should use to communicate safety information. That determination is left to the judgment of the Park Service.

100. The Park Service provided safety information pursuant to chapter 19 in brochures, visitor center displays, and bulletin boards. It also manned the Canyon Warming Hut with personnel who could provide information about the trails in the area.

101. Chapter 23 of NPS–50 states that "if roads and trails cannot be maintained as designed and built, they should either be closed or the public adequately warned." (Exhibit 50 at Chapter 23, page 1.1)

102. The definitions of the terms "maintained" or "adequately warned" are not provided. The determination of what these terms mean is left to the judgment of the Park Service.

103. Chapter 23 also states that hand railings at overlooks, stairs, bridges and other outdoor locations should be 42″ in height, with no more than 6″ between intermediate railings. (*Id.*)

104. This chapter does not require that the Park Service remove snow during the winter from every overlook, stair, bridge or outdoor location which has a guardrail. Pursuant to the NPS–50 Policy statement, the Park Service is required only to attempt to provide "a reasonably safe recreating environment." The determination of which areas will have snow removed is left to the judgment of the Park Service.

105. Any excessive gap between the top and intermediate railings was not the cause of the accident, since the entire guardrail was covered in snow. (Testimony of B. Hronek)

106. Chapter 23 applies only to the construction of new guardrails. When the guardrail at the end of the Trail to the Brink of the Lower Falls was constructed in 1957, the relevant guideline suggested only the construction of a 36″ guardrail, with no requirement for an intermediate railing. (*Id.*)

107. The Trail to the Brink of the Lower Falls and its observation decks are routinely inspected during non-winter months. There have been no allegations that the guardrails did not provide adequate protection for visitors.[1]

---

1. The plaintiffs have intimated that the Park Ser-

vice has little interest in visitor safety issues,

108. Appendix P of NPS–50 states that "in making aesthetics, natural, historic or other considerations, the safety of the user must receive due consideration." As part of this effort, the Park Service must "insure that all *reasonable* efforts are made to alleviate the [hazards] and be coexistent with the preservation of the resource." (Exhibit 50 at Appendix P, page 1)

109. No definitions of the terms "safety" "due consideration" or "reasonable efforts" are provided.

110. The determination of the meaning of this guideline is left to the judgment of the Park Service.

111. Appendix E to NPS–50 states that "scheduled inspection of work site and visitor use areas should be conducted and recorded by the person responsible for the area." (NPS–50 at Appendix E, page 1)

112. No definitions of the term "visitor use area" is given in NPS–50.

113. The determination of the meaning of this guideline is left to the judgment of the Park Service.

114. The Park Service has historically interpreted the term "visitor use area" to refer to developed areas of the Park, such as facilities and buildings. Trails have never been interpreted to fall within this term. (Testimony of J. Lounsbury, R. Pippenger)

115. The Park Services is not required, pursuant to Chapter E of NPS–50, to inspect unmaintained trails during the winter.

116. The National Park Service Sign Manual states that: "wherever there is a hazard that might *reasonably* be expected to result in injury . . . signs warning of the hazard must be installed. The need for and the placement of this type of sign shall be carefully considered to insure that persons . . . will be adequately warned . . ." (emphasis added) (Exhibit 61 at 4–4)

117. No definition of the terms "hazards," "reasonable expectation of injury," "careful

consideration" or "adequately warned" are given.

118. Those determinations are left to the judgment of the Park Service.

119. The NPS Trail Management Handbook requires that trails "should be adequately marked to warn visitors of safety hazards." (Exhibit 49 at 1, 23, 39)

120. The Handbook recognizes that "signing needs vary according to the type of trail" and that the design of a trail must consider competing interests, including preservation of the natural environment, safety of visitors, and the aesthetic quality of an area. In addition, the Handbook states that the information it contains "should be used as a guideline." (*Id.*)

121. No definitions of the terms "adequate warning," "hazard," "unsafe," or "corrected" are given.

122. The determination of whether to place a sign along a trail is left to the judgment of the Park.

123. 36 C.F.R. § 7.13(j) provides that "foot travel in all thermal areas and within the Yellowstone Canyon between the Upper Falls and Inspiration Point must be confined to boardwalks or trails that are maintained for such travel and are marked by official signs." The plaintiffs have argued that this regulation required the Park Service to place a closed sign on the Trail to the Brink of the Lower Falls since it was not maintained during the winter.

124. This regulation does not provide definitions for the terms "maintained" or "marked by official signs."

125. The determination of the meaning of those terms, and their application, is left to the judgment of the Park Service. (Testimony of J. Lounsbury)

126. The Park Service believes that the purpose of that regulation is to provide authority to limit travel in certain areas of the Park to trails or boardwalks set aside for

---

focusing on an accident involving a boy along Uncle Tom's trail during the summer of 1988. An investigation after the accident concluded that alterations to the guardrail along the trail were not necessary. In addition, no one wit-

nessed Dennis Rumple's fall, and it is impossible to state whether he fell through or over the guardrail. (Testimony of J. Lounsbury, R. Pippenger, S. Rumple)

that purpose. It has never interpreted this regulation to mean that it is required to remove snow from unmaintained trails which visitors may use during the winter. (*Id.*)

127. There is no basis to conclude that the term "maintained," as used in 36 C.F.R. § 7.13(j), relates to the removal of snow from any of the trails in Yellowstone National Park during the winter. (*Id.*)

128. If such a definition were used, the majority of trails in thermal areas in Yellowstone and in the Canyon area would be closed to winter visitors. Since Yellowstone is comprised of untold numbers of thermal areas, much of the Park would be off limits to winter visitors. (*Id.*)

129. The intent of the regulations was not to close a majority of the Park during the winter. (*Id.*)

130. The Park Service has always interpreted the term "maintained," as it is used in 36 C.F.R. § 7.13(j), to refer to established trails or boardwalks which have been set aside for visitor use. (*Id.*)

131. 36 C.F.R. § 7.13(g) holds that no entrance fees shall be charged for persons who have not reached their sixteenth birthday.

132. On the date of the accident, David Childers was eleven years old.

### CONCLUSIONS OF LAW

1. This litigation presents five issues which must be addressed: (a) does the Court have subject matter jurisdiction, under the FTCA, to evaluate the Park Service's treatment of unmaintained trails in Yellowstone during the winter; (b) does the United States have a duty, under Wyoming law, to warn visitors of the danger associated with the natural accumulation of snow and ice; (c) did the Park Service's management of the Trail to the Brink of the Lower Falls meet the applicable standard of care; (d) does the plaintiffs' own negligence bar recovery under the Wyoming Comparative Negligence Statute; and (e) does the Wyoming Recreational Use Statute bar any claim by David Childers' estate.

*(a) The Discretionary Function Exception Bars Claims Relating To The Park Service's Treatment Of Unmaintained Winter Trails.*

2. Subject matter jurisdiction under the FTCA is a threshold jurisdictional question which must be resolved before the Court can address the merits of the Childers' allegations. *Johnson v. United States*, 949 F.2d 332, 335 (10th Cir.1991).

3. The FTCA waives the federal government's sovereign immunity when United States employees are negligent in the scope of employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). This broad waiver of sovereign immunity is limited by the discretionary function exception, which states that the waiver of immunity does not apply to "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The question before this Court is the scope of the discretionary function exception.

4. In general, the purpose of the above stated exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). Therefore, the exception applies to the establishment of federal programs, the promulgation of regulations designed to carry out those programs, and other decisions which are grounded in the same social, political, and economic considerations which form the bases of those programs and regulations. *United States v. Gaubert*, 499 U.S. 315, 323–26, 111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991).

5. In deciding whether the exception applies, courts must first determine whether the acts relied upon as the basis for

the claim allowed federal employees to exercise judgment or choice. *Gaubert,* 499 U.S. at 322, 111 S.Ct. at 1273. If a statute, regulation, or policy mandates a specific course of action, the discretionary function exception does not apply. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). Where judgment and choice are allowed, however, the discretionary function exception protects the ability of federal employees to "act according to one's judgment of the best course...." *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953). If the act at issue allowed the federal government to exercise judgment or choice, courts must then determine whether the act was "of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1959. As noted above, the kinds of decisions to which the exception applies are those which are grounded in considerations of "social, economic or political policy." *Varig,* 467 U.S. at 814, 104 S.Ct. at 2765.

6. *Dalehite,* for example, arose out of the destruction of Texas City, Texas, when ships loaded with ammonium nitrate fertilizer exploded. 346 U.S. at 18, 73 S.Ct. at 959. The fertilizer had been produced and distributed according to specifications established by the federal government. *Id.* The Supreme Court concluded that all of the acts alleged by plaintiffs were protected by the discretionary function exception, because they involved judgment or choice by federal officials, and they were grounded in considerations of public policy. *Id.* at 42, 73 S.Ct. at 971. For example, the Court held that the federal government's decisions about its plans for manufacturing the fertilizer, the choice of fertilizer coating, and the temperature of the fertilizer during packaging were protected because they required "consideration of a vast spectrum of factors, including some which touched directly on the feasibility of the fertilizer export program...." *Id.*

7. The Court also concluded that the choice of warning labels for the fertilizer bags fell within the discretionary function exception. *Id.* at 41, 73 S.Ct. at 970. The regulations which set the labelling standards did not require any specific warnings, other than describing the fertilizer as an "oxidizing material." *Id.* at 42, 73 S.Ct. at 971. Federal employees had a choice, therefore, about what other warnings or descriptions, if any, would appear on the bags. The Court concluded that the failure to warn about the explosive nature of the fertilizer fell within the discretionary function exception because it involved choice and "serious judgment" on the part of the United States, which involved considerations of public policy. *Id.* at 41, 73 S.Ct. at 970.

■ 8. The question of whether the discretionary function exception applies does not depend on whether federal employees actually took policy considerations into account. Instead, the application of the exception depends on "the *nature of the actions taken* and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275 (emphasis added); *Kennewick Irr. Dist. v. United States,* 880 F.2d 1018, 1028–29 (9th Cir.1989). The Supreme Court in *Gaubert* explained that:

> If a regulation allows the employee discretion, the very existence of the regulation creates a *strong presumption that a discretionary act authorized by the regulation involves the same policies which led to the promulgation of the regulations....* When established government policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, *it must be presumed that the agent's acts are grounded in policy when exercising that discretion.*

499 U.S. at 324, 111 S.Ct. at 1274 (emphasis added). Judicial inquiry of such activities is the kind of second-guessing the exception prevents.

■ 9. Similarly, the discretionary function exception applies even if the conduct is deemed negligent. *Id.* If this were not the case, the exception would be eviscerated.

■ 10. Plaintiffs' allegations implicate National Park Service decisions relating to the treatment of unmaintained trails during the winter. Specifically, they confront the determination that the Park Service would

not close nor place winter warning signs along unmaintained winter trails. Like the acts at issue in *Dalehite, Varig,* and *Gaubert,* the discretionary function exception protects such choices from judicial "second-guessing" because they were the product of the National Park Service's policy-based decisions about how best to balance the competing concerns of keeping the Park open during the winter, and visitor safety.

11. Under the provisions of 16 U.S.C. § 1, the National Park Service has the responsibility to "conserve the scenery and the natural and historic objects and the wildlife" within the national parks and, at the same time, "provide for the enjoyment of the same in such a manner and by such means as will be then unimpaired for the enjoyment of future generations." The tension in 16 U.S.C. § 1 between the National Park Service's mandate to preserve the national parks and its responsibility to provide public access to these lands for recreational and other purposes creates the situation in which it must exercise judgment and choice about what sorts of facilities and safety features, if any, to provide. Furthermore, National Park Service decisions about safety measures require the consideration of myriad public policy factors, including cost, feasibility, and aesthetics.

12. The Yellowstone Ranger Operating Procedure ("ROP") for the closure of trails illustrates the competing concerns park rangers must consider. It demonstrates that the Park Service must exercise choice, thereby satisfying the first prong of *Berkovitz.* The ROP instructs that:

> Closing or restricting access to any area of YNP is a serious management/operational decision. On one hand we must *protect* visitors and the resource from injury or damage and we must also allow maximum possible use access for the people to *their* Park.... On the other hand, having an area closed that is closed because someone forgot to open it, or look at it to see if it should be open, causes a credibility problem with visitors, park management, congressman, etc ...

Exhibit 32(a).

13. The competing factors of visitor safety and public access mandate that park rangers exercise judgment in determining when to close trails. Recognizing that there are no hard and fast rules, the ROP instructs only that, "an area or trail *may* be closed ... based upon the determined and preplanned need to provide human safety and/or minimize the human impact on the natural or cultural resources" (emphasis added). *Id.* at 2. By using the word "may," the ROP specifically leaves the decision of closure to the discretion of the ranger.

14. The Park Service's Loss Control Management Program Guideline ("NPS–50") grants similar discretion to park rangers. A safety guideline, NPS–50, states that the Park Service is "committed to providing a *reasonably* safe recreating environment for visitors while recognizing our mandated responsibility to protect the resources and natural processes which can be inherently dangerous to the unwary (emphasis added)." (Exhibit 50 at Introduction). These competing interests are further defined in: (1) Chapter 16 of NPS–50, which requires the Park Service to identify hazards that have the potential for injury, illness, or property damage and to take "all *reasonable* efforts ... to alleviate the problem"; and (2) Chapter 23, which requires that if a trail cannot be maintained as it is designed the Park Service must either close it or "adequately warn" the public. Since no guidance is given at to what these terms mean, the determination of a "potential" for injury, "reasonable" effort to alleviate that "potential" and "adequate warning" is left to the discretion of the Park Service. *Id.* at 1.

15. Indeed, even plaintiffs' expert, Bruce Hronek, supported the Park Service's contention that it must exercise judgment in determining whether to close trails or to use warning signs. For instance, when discussing the NPS–50 guideline that "every effort should be made to identify hazards ... [and that] [a]fter identification, all reasonable efforts shall be made to alleviate the problem" (Chapter 16 at 1), Mr. Hronek admitted that the Park Service retained the discretion to determine how best to alleviate safety concerns:

Q In the second sentence it states after identification, "all reasonable efforts shall be made to alleviate the problem." Is the term "reasonable effort" defined anywhere?

A I don't know whether they need to be defined, but no, I don't see them as a definition, you know, *per se.*

Q Again I take it you would agree that in actually implementing this guideline and specifically the determination of reasonable efforts that there has to be again some exercise, some judgment exercised, on the part of the Park Service?

A The word "reasonable" indicates that, sure.

Q One person's definition of reasonable may differ from another person's definition?

A I'm sure that's true.

Deposition at 76–77.

16. Mr. Hronek also admitted that Chapter 23 of the NPS–50 guideline, which purportedly provides plaintiffs' primary support, was susceptible to discretion. That guideline holds that "if roads and trails cannot be maintained as designed and built, they should either be closed or the public adequately warned." NPS–50, Chapter 23 at 1.1. During trial, Mr. Hronek confirmed his deposition testimony that the NPS had to exercise judgment to implement it:

Q Okay. What does adequate warning mean?

A I think's that's the eye of the beholder type of question....

Q And I take it you would again agree that it requires some judgment on the part of the Park Service in the implementation?

A That's the kind of judgment I'm talking about, yes, definitely.

Deposition at 81–82.

17. During trial, Mr. Hronek also confirmed his deposition testimony that discretion is inherent in implementing the safety guidelines set forth in Appendix P to the NPS–50:

Q Okay. Let's look at this a little bit more closely. In the second paragraph it

says, "In making aesthetic, natural, historic or other considerations, the safety of the user must receive due consideration." Is the term "due" defined anywhere here?

A No.

Q That's left to the Park Service to determine what due consideration is, right?

A Uh-hm, I would agree.

Q Further on, "To achieve this goal every effort shall be made." What's the definition of "every" in this context?

A All reasonable, it's a reasonable question.

Q But reasonable depends on the terms that you used earlier, the eye of the beholder?

A Meaning many ways, yes.

Q Let's go on to No. 2, "Insure that all reasonable efforts are made to alleviate the problem." Again I take it you would agree that the term reasonable isn't defined here.

A No, it's not.

Q That's left to the determination of the Park Service?

A In the context—yes, in the context of the other, sure, it is.

Q And then the expression "to alleviate the problem," now alleviate doesn't mean that the problem is wiped out or ultimately resolved, does it?

A Alleviate, that's not the intent. That means to relieve the problem. There is—

. . .

Q Now, there is someone else out there who is also an expert in recreation management who has a different—potentially may have a different opinion as to what alleviate that problem in the context of that trail is, correct?

A They may have a different opinion, certainly.

Q And again the determination of reasonableness is left to the eye of the beholder?

A Uh-hm.

Deposition at 105–108.[2]

■■■ 18. The decision whether to close the Trail to the Brink of the Lower Falls or

**2.** Mr. Hronek noted similar discretionary authority in Yellowstone's Ranger Operating Procedure

post warning signs is clearly discretionary because it involves an element of judgment or choice. There is no statute, regulation or guideline which requires a particular course of action. Since the only relevant guidelines provide nothing more than general direction, the first prong of *Berkovitz* has been satisfied.

19. The next question under the *Berkovitz* analysis is whether the decision to close or to place warning signs along unmaintained winter trails was based upon considerations of public policy. These decisions inherently require a balancing of public policy objectives, such as resource allocation, visitor safety and visitor access.

20. The decision-making process utilized by District Ranger Lounsbury with respect to the Trail to the Brink of the Lower Falls illustrated how he balanced these competing interests. He rejected a recommendation to close the trail for the winter because he believed that such a decision would improperly limit the public's access to a unique area of Yellowstone. He also analyzed visitor safety issues, concluding that winter conditions along the trail did not present an unusual danger to visitors. The ultimate decision to keep the trail open, but to discourage its use by removing trailhead identification signs and not listing it on winter maps, attempted to balance these competing concerns.

21. District Ranger Lounsbury's decision reflects a similar dilemma faced by the Park Service when it decided to keep unmaintained winter trails open to the public. Since it would be infeasible to maintain, inspect, or even to place winter warning signs along such trails, the Park Service was confronted with a choice whether to keep these trails open at all. Rather than drastically limit access to the Park during the winter, and thereby run afoul of the 16 U.S.C. § 1 requirement to make as much of the Park accessible to the public as possible, the Park Service chose to keep unmaintained trails open during the winter.

22. *Pope & Talbot v. Dept. of Agriculture*, 782 F.Supp. 1460 (D.Or.1991), recently recognized the discretionary nature of closure decisions. The court found that, under the regulatory standards and the Forest Service Manual, Forest Service decisions regarding closures were not specific and mandatory. *Id.* at 1463. Title 36 C.F.R. § 261.-50, for instance, stated that:

(a) [t]he Chief, each Regional Forester, each Experiment Station Director ... and each Forest Supervisor *may* issue orders which close or restrict the use of described areas within the area over which he has jurisdiction ... (emphasis added).

The Forest Service Manual [FSM] provided that:

To the extent possible, wildernesses ... must be open to public use, free of unnecessary restrictions. When the risk is so great that it cannot be tolerated by both Forests, and significant and substantial efforts in prevention activities cannot satisfactorily mitigate that risk, restrictions *may* be applied (emphasis added).

*Id.* at 1464.

23. The court recognized that closure depends upon the Forest Service's "evaluation and weighing of the public's need for open forests" and a myriad of other factors. *Id.* at 1465. The use of the word "may" in both the Forest Service's closure regulations, and the Yellowstone closure ROP, supports the policy based nature of such decisions.

24. Courts have also traditionally concluded that National Park Service decisions regarding the use of warning signs are discretionary. Placement of signs in and around trails involves decisions by park administrators which present numerous alternatives. Among these alternatives are whether or not to warn, if warning is decided upon, the type of warning, the placement of signs, the wording of signs, and the areas which require such signs. If a court evaluates such choices, it will necessarily engage in second-guessing policy determinations.

for trail closures, admitting that there were a number of factors to consider before closing a trial, and that there was "some versatility" in its implementation. Deposition at 69–70. Similar

statements were made about the Trail Management Handbook and the NPS Sign Manual both at trial and during his deposition. (Deposition at 84, 141, 142)

25. A case factually similar to the instant litigation, *Fahl v. United States*, 792 F.Supp. 80 (D.Az.1992), involved a fall from the South Rim in the Grand Canyon National Park. The complaint alleged that the defendants owed a duty to the decedent to maintain Grand Canyon National Park in a manner reasonably safe for tourists. Specifically, the plaintiff alleged that the Park Service "acted negligently and/or willfully with respect to.... signing ... of the park against the dangers and risks of serious harm caused by inadequate.... warnings in and near the area from which the decedent fell." *Id.* at 81.

26. Recognizing "that the Park Service would make a policy judgment that certain areas were in need of warnings and guardrails and certain areas were not," the court refused to second-guess these decisions. *Id.* at 82. It accepted that the Park Service had to exercise discretion to determine the necessity for warning signs, and that those choices reflected its belief how best to manage the Park, writing:

> Requiring the Park Service to place guardrails and warnings at every conceivably dangerous place in the Park would certainly conflict with the avowed policy of attempting to interfere as little as possible with nature in addition to being an extremely costly undertaking.

*Id.* at 83.[3]

27. Circuit courts have also routinely protected such decisions. For instance, in *Kiehn v. United States*, 984 F.2d 1100 (10th Cir.1993), the plaintiff suffered serious injuries after falling off sandstone rock formations in Little Rainbow Park at the Dinosaur National Monument. He alleged, among other things, that the Park Service was negligent in failing to warn of the unstable condition of the sandstone rock formations. The district court dismissed the failure to warn claim for lack of subject matter jurisdiction based upon both the discretionary function exception to the Federal Tort Claims Act, and the Utah Limitation of Landowner Liability Act.

28. In affirming the district court's decision, the Tenth Circuit accepted that the NPS guidelines do not contain a litmus test to determine when to use warning signs. It wrote that "the decision whether or not to post warning signs at Dinosaur National Monument is clearly discretionary as it 'involves an element of judgment or choice.' There is no statute, regulation or agency policy requiring the NPS to warn visitors of potential dangers, or more specifically, requiring the NPS to place signs which warn people that scaling sandstone cliffs may be dangerous." *Id.* at 1103.

29. Similarly, in *Johnson v. United States*, 949 F.2d 332 (10th Cir.1991), the Tenth Circuit ruled that the Park Service's decision to limit warnings about the potential dangers of mountain climbing in Grand Teton National Park was discretionary. In that case, the family of a climber who was killed alleged that the Park Service, among other things, failed to provide adequate warnings about the hazards of climbing. The district court rejected the claim because Wyoming did not impose a duty upon the Park Service to undertake these tasks. The Tenth Circuit, although affirming the judgment, dismissed the action because of the lack of subject matter jurisdiction, ruling that the decision about the placement and adequacy of warnings was a discretionary act. *Id.* at 338.[4]

---

3. The plaintiffs also cannot establish that the Park Service failed to follow internal guidelines which required either the inspection or the removal of snow from unmaintained winter trails. The Canyon Subdistrict Winter Operations Plan for the 1989/1990 winter season required such activities only for maintained trails. Exhibit 31. In the Complaint, the plaintiffs mistakenly relied upon the 1990/1991 Winter Operations Plan. In effect during the winter season *after* the accident, that plan required both routine inspections of the five maintained trails *and* the closure of the Trail to the Brink of the Lower Falls. (Exhibit 30).

4. *See also, Martin v. United States*, 546 F.2d 1355, 1360 (9th Cir.1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977), which held that "[t]o require the Park Service to post signs and warnings on every boardwalk, path or trail every few hundred feet throughout a park as extensive as Yellowstone would not only be prohibitive in cost but would destroy the Park's beauty as well." Similarly, in *Zumwalt v. United States*, 928 F.2d 951 (10th Cir.1991), the Tenth Circuit ruled that the Park Service's decision not to post additional signs along a trail was discretionary because the Park Service's guide-

■ 30. The decision not to place signs warning of winter hazards along unmaintained trails was not a "distinct, non-policy decision." *Johnson* at 949 F.2d at 338. On the contrary, the determination reflected the Park Service's belief how best to manage the Park during the winter. It logically concluded that the placement of such signs along all unmaintained winter trails which are used by the public and present dangers would be impractical. The Park Service also believed that their placement would increase the risk to the public since such signs would alert visitors to the existence of trails that they otherwise would not have known existed. Seeing such signs, visitors would likely assume that the Park Service either maintained or, at a minimum, inspected those trails. Since the Park Service could not have accomplished these tasks, it opted instead to provide general warnings through park brochures, visitor entrance displays, and personal contacts in the Canyon Warming Hut. It also discouraged use of such trails by not illustrating them in Park maps or brochures or advertising their existence by placing winter signs at the trailheads.

31. Like the decisions made in *Fahl* and *Johnson*, here the Park Service had to determine how best to balance its goal of keeping the Park open during the winter, with the concept of visitor safety. No regulations or guidelines provided a litmus test to determine the best course of action. Since only general guidelines existed, the decisions necessarily involved judgment and choice. Although the parties can certainly dispute the merits of those decisions, they reflected the Park Service's best judgment about how to manage the Park. Since such decisions necessarily involve policy decisions based on social, economic or political considerations, the discretionary function exception applies.

■ 32. Plaintiffs have argued that § 2680(a) is limited to decisions made in the exercise of judgment at a planning level of government, as opposed to decisions made in the course of implementing that policy. This position was most recently rejected in *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Supreme Court's latest decision interpreting § 2680(a). *Gaubert* arose out of the failure of a bank which had come under the supervision of the Federal Home Loan Bank Board ("FHLBB"). *Id.* at 319, 111 S.Ct. at 1271. In reversing the district court's decision granting the United States' motion to dismiss, the Fifth Circuit held that § 2680(a) applied only to "policy decisions" taken by the FHLBB, and that the implementation of those decisions on a day-to-day basis was not covered by the exception. *Id.* at 319–23, 111 S.Ct. at 1272–73.

33. The Supreme Court reversed, holding that the implementation of policy-based decisions is also protected by the discretionary function exception, so long as there is the same opportunity for judgment or choice as existed on the policy or planning levels:

> A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions.

*Id.* at 325, 111 S.Ct. at 1275. Therefore, § 2680(a) applied both to the FHLBB's initial decision to supervise the thrift's activities, and the acts taken by federal regulators who became involved in the day-to-day operations of the institution. *Id.* If an element of judgment or choice is established, the Court added, actions taken on the operational level "must be presumed" to be grounded in the same policy which led to the establishment of the program in the first place. *Id.* at 324, 111 S.Ct. at 1274.

34. In this case, as in *Varig* and *Gaubert*, the discretionary function exception applies not only to the initial decision by the NPS to take safety precautions at Yellowstone, but also to the implementation of that decision at specific locations. The necessity to exercise

lines did not provide a litmus test to determine how to sign trails. Compare *Summers v. United States*, 905 F.2d 1212 (9th Cir.1990), which held that the United States should have warned visitors of the dangers of a fire pit it had constructed in an urban recreation area. *See also, Schieler v. United States*, 642 F.Supp. 1310, 1312, 1313 (E.D.Ca.1986) (warnings call for the "exercise of judgment and discretion by administrators and officers of the Park Service") and *Zuk v. United States*, 698 F.Supp. 1577, 1581 (S.D.Fl.1988) ("... the decision not to place warnings in the areas where Plaintiff fell was a discretionary one.")

judgment or choice and the policy considerations employed arise out of the provisions of 16 U.S.C. § 1, which require the NPS to balance the extent to which it will emphasize preservation, public use, or visitor safety at each national park.

35. Plaintiffs rely primarily on two Tenth Circuit cases, *Smith v. United States*, 546 F.2d 872 (10th Cir.1976), and *Boyd v. United States*, 881 F.2d 895 (10th Cir.1989), to support their claim that decisions regarding trail closures and warning signs are *per se* nondiscretionary decisions since they do not involve social or political considerations. This position is misguided for three reasons. First, the *Smith* court's analysis of § 2680(a) has little precedential value because the case was decided before the Supreme Court's recent trilogy of discretionary function decisions. For example, that court discounted the significance of any policy judgments made by low-level employees. *Id.* at 877, n. 5. The Supreme Court has since shielded the government from liability for the individual policy judgments of low-level employees conducting compliance reviews of aircrafts. *Varig*, 467 U.S. at 820, 104 S.Ct. at 2767. It has also rejected the planning/operational test *Smith* relied upon to evaluate the discretionary function exception. *Gaubert*, 499 U.S. 315, 111 S.Ct. 1267.[5]

36. Second, the Tenth Circuit has recently rejected the notion that warnings are not within the discretionary function exception. *See e.g., Miller v. United States*, 710 F.2d 656 (10th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983) (failure to warn of dangerous road conditions not an actionable claim under FTCA); *Zumwalt v. United States, supra*, (NPS' failure to post additional warning or directional signs along a trail was discretionary); *Johnson v. United States, supra*, (NPS' placement and determination of the adequacy of warning signs were discretionary decisions); and *Kiehn v. United States, supra*, (decision not to place sign warning of dangers deemed discretionary).

37. Third, the *Smith* and *Boyd* courts concluded that the government's failure to warn was not connected to the policy decision which created the hazard. For instance, in *Smith*, the ranger testified that the absence of warning signs was not related to any policy decision, but rather to a perceived lack of need of warning signs in that area. 546 F.2d at 877, n. 5. In *Boyd*, the failure to warn swimmers that boats were permitted in a swimming area bore no relation to the decision about how to develop the area. *Boyd*, 881 F.2d at 898, n. 3. In the instant case, the NPS decision not to place winter warning signs along unmaintained trails which are open, however, cannot be divorced from the policy decisions of how best to manage Yellowstone during the winter. These decisions are a "branch on the tree" of the larger question dealing with the core purpose of the Park, namely, whether it can even be open for visitors during the winter.

38. Plaintiffs' expert, Bruce Hronek, captured the dilemma facing Park administrators. Mr. Hronek believes that the NPS has the duty either to close, or to maintain any winter trail at Yellowstone which attracts visitors and presents some danger to the public. (Deposition at 73–74, 38, 39, 40, 156, 64–66). This standard would place an enormous burden on the NPS. Since it would be virtually impossible to maintain all such winter trails at Yellowstone, the NPS would have to close large portions of the Park. Such an action would directly conflict with the statutory mandate to provide access. 16 U.S.C. § 1.

*(b) The United States Had No Duty To Warn Of The Dangers Associated With Snow And Ice.*

39. The waiver of sovereign immunity under the FTCA is limited to circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Under this standard, as a matter of law, the United States did not breach the applicable standard of care since Wyoming law does not impose a duty to warn of the dangers associated with snow and ice. *Blue-*

---

5. Courts have recognized the questionable value of *Smith*. For instance, in *Zumwalt v. United States*, 712 F.Supp. 1506, 1514 (D.Ks.1989), *aff'd*, 928 F.2d 951 (10th Cir.1991) the court "question[ed] whether [*Smith*] has continuing precedential authority because of later case law."

**1020**

*jacket v. Carney,* 550 P.2d 494, 497 (Wy. 1976). This rule operates as an absolute bar to recovery.

40. Wyoming has applied this rule in cases involving snow and ice. For instance, in *Bluejacket,* a patron brought an action against the owners of a mountain lodge for injuries sustained when he slipped on an icy path while walking from the lodge to his cabin. Noting that the accident had occurred in a mountain setting, the court rejected the plaintiff's claim, ruling that "the conditions created by the elements, such as the forming of ice and falling of snow, are universally known and there is no liability where the danger is obvious or is as well known to the plaintiff as the property owner." *Id.* at 497. *See also, Sherman v. Platte County,* 642 P.2d 787, 789 (Wy.1982) ("[f]irst there is the rule that no duty exists which requires either the removal of an obvious danger or warning of its existence. Second is the rule that no duty exists to remove the natural accumulation of snow and ice.

... it covers that class of cases where the ice and snow naturally accumulate in a fashion where there is a lurking danger, i.e., the ice is covered by the snow.")[6]

41. No case law supports the proposition that this absolute bar is waived for children. Indeed, an exception could not logically exist. If children were treated differently, the defense would be vitiated since a landowner could never reasonably anticipate that only adults would enter his land.

42. Courts have uniformly required visitors to Yellowstone to exercise common sense when dealing with natural conditions. For instance, in *Smith v. United States,* 383 F.Supp. 1076 (D.Wy.1974), *affirmed,* 546 F.2d 872 (10th Cir.1976), the district court confronted a case where a fourteen year old fell into a thermal hot pool. Recognizing that there was no feasible way to make all thermal hot pools in Yellowstone safe, the court ruled that it was unreasonable to "erect boardwalks, guardrails, barricades, fences or signs with respect to each and every thermal feature in the park, particularly when the danger of such thermal features is apparent, obvious and notorious." *Id.* at 1081. The court also noted that the United States is not an insurer of the safety of children in national parks. *Id.*[7]

43. The accident in this case was caused by the natural accumulation of snow and ice.

---

**6.** *See also, O'Donnell v. City of Casper,* 696 P.2d 1278 (Wy.1985), which explicitly affirmed *Sherman,* holding that "there was no duty to remove the natural accumulation of snow and ice." *Id.* at 1282. It reasoned further that the "danger presented by ... snow and ice does not generally create liability ... because the accumulation is natural." *Id.* at 1283.

Four years after *O'Donnell,* the Wyoming Supreme Court reaffirmed that accidents resulting from natural accumulations of snow and ice would be barred. In *Stephenson v. Pacific Power & Light Company,* 779 P.2d 1169 (Wy.1989), it wrote:
Our recent decisions with respect to the obvious danger rule compel a similar conclusion. In *O'Donnell v. City of Casper,* 696 P.2d 1278 (Wyo.1985), we addressed the impact of comparative negligence on the obvious danger rule, *concluding that those situations wherein the obvious danger rule operates to negate a duty on behalf of the property owner—i.e., operates as an absolute bar to recovery—were narrowly limited to dangers presented by naturally existing conditions, particularly accumulations of ice and snow.* (emphasis added) *Id.,* at 1179–1180.
Plaintiffs in the past have mistakenly relied upon *Petersen v. Campbell County Memorial Hos-*

*pital District,* 760 P.2d 992 (Wy.1988), for the proposition that the NPS had a duty to remove snow from the observation deck. That case involved a patient who fell down snow-covered steps leading from a hospital to a parking lot. The Wyoming Supreme Court affirmed the lower court's grant of summary judgment to the hospital district on the grounds that it did not have a duty to remove naturally occurring accumulations of snow. It wrote:
The hospital district begins its argument by citing this court's holding in *Sherman v. Platte County,* 642 P.2d 787, 789 (Wyo.1982). That case is squarely on point and cancels any alleged hospital district liability for failure to remove naturally occurring accumulations of snow and ice.
*Id.,* at 994. Contrary to plaintiffs' assertions, the Court did not impose a duty to remove the snow so that the handrails would be uncovered.

**7.** *See also, Henretig v. United States,* 490 F.Supp. 398, 405 (S.D.Fl.1980), a suit brought by a plaintiff who injured her ankle while walking on a trail in Yellowstone. The court ruled that the Park Service had not breached a duty by failing to erect warning signs alerting visitors that they could lose their footing on gravel which had accumulated on the trail.

Since Wyoming law establishes an absolute bar to such claims, the United States had no duty to warn of the dangers associated with travel either along the Trail to the Brink of the Lower Falls, or on the observation decks.

*(c) The Park Service's Management Of The Trail To The Brink Of The Lower Falls Fell Within The Applicable Standard Of Care.*

44. It is not feasible for the Park Service to maintain all of the trails used by the public during the winter. Because of the inherent dangers associated with any visit to Yellowstone, particularly in the winter, it is also impossible to reduce all of the risk or, indeed, to warn visitors of all risks.

45. The Park Service provided warnings to winter visitors primarily through the use of brochures. The "Yellowstone Today" publication, for instance, informed visitors that trails and overlooks in the Canyon area, specifically, and in the Park generally, were icy and snowpacked. The "Yellowstone Winter Guide" warned visitors to stay on maintained trails.

46. The Park Service provided visitors with the "Canyon Winter Guide", which indicated where the maintained overlooks in the Canyon area were located. This information was also illustrated on maps hung on walls inside the Canyon Warming Hut.

47. The Park Service also instructed visitors in these publications to seek further information about the status of trails from Park Service employees at visitor centers, such as the Canyon Warming Hut. It is undisputed that George Sechrist and Melanie Weeks were available on the date of the accident at the Canyon Warming Hut to provide information regarding the status of trails in the area.

48. The Court concludes that adequate warnings about the winter conditions of the trails and overlooks in the Canyon area were available to the public during the 1989/90 winter season.

49. In addition to the warnings enumerated above, the Childers also walked past a sign along the Lookout Point Trail which warned them that footing along the trail was hazardous and that caution should be exercised. Given that the Lookout Point Trail was maintained, it was incumbent upon the Childers to exercise even more caution along the Trail to the Brink of the Lower Falls, an unmaintained trail.

50. The Park Service was not obligated to close the Trail to the Brink of the Lower Falls. The intensity of dangers associated with that trail, although different in nature from other trails, were not substantially different than those along other unmaintained trails in the Park. Indeed, assuming reasonable care was not exercised by visitors, any of the trails surrounding the thermal areas of the Park posed equal dangers.

51. The Park Service has an obligation under 16 U.S.C. § 1 to make as much of the Park available to the public as possible. This statutory duty is unlike any duty a private landowner may have who makes his land available to the public.

52. Since no regulation or guideline explicitly required closure, the Park Service had to determine how best to fulfill its duty under 16 U.S.C. § 1 to make as much of the Park available to the public as possible, while considering visitor safety. Its decision: (1) to keep unmaintained trails open to the public; (2) not to list them on Park Service maps; and (3) to remove the trailhead identification sign from the Trail to the Brink of the Lower Falls, was appropriate given the statutory mandate.

53. No regulation or guideline required the Park Service to place warning signs along a trail. To the extent that relevant guidelines exist, the Park Service is required only to make a determination of how best to warn the public.[8]

54. The Park Service must consider whether the placement of a warning sign

---

8. Even if such guidelines were violated, the United States would not have breached the standard of care, since it is liable only to the extent a private person would be liable. Park Service guidelines cannot give rise to a duty. *Art Metal-*

*USA, Inc. v. United States,* 753 F.2d 1151 (D.C.Cir.1985) and *United Scottish Insurance Co. v. United States,* 614 F.2d 188 (9th Cir.1979), *rev'd on other grounds,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

along a trail will increase the risk to the public. It was argued at trial that winter warning signs placed along unmaintained trails would have: (1) alerted visitors to the presence of trails which they might otherwise not have known existed; and (2) suggested to the public that the Park Service had inspected the trails. Since it is not feasible for the Park Service during the winter to inspect either this trail specifically, or unmaintained trails generally, the use of signs may have increased the risk to the public.

55. In response to the above arguments, plaintiffs suggested that the Park Service could have placed a warning sign further along the trail so that visitors unfamiliar with the area would not know that a trail existed. This argument is inappropriate for two reasons. First, once a warning sign is posted, the Park is obligated to conduct an inspection to determine if it is still standing. This would not be feasible because of the limited staff available in the Canyon during the winter. Second, the inspections would make it more likely that visitors would know that a trail existed since rangers would leave evidence that they had walked down the trail during their inspections.

56. Given the number of general warnings available to the public, I find that the Park Service's decision not to place a warning sign along the trail to the Brink of the Lower Falls was appropriate. Had it done so, the Park Service would likely have increased the level of risk to the public.

57. Robert Manning, a Professor at the University of Vermont's School of Natural Resources, provided persuasive testimony that the Park Service's actions with respect to unmaintained trails generally, and the Trail to the Brink of the Lower Falls, specifically, were appropriate. Dr. Manning has studied the management of national and state parks throughout his professional career and has conducted numerous studies which determined the effectiveness of various types of warning to the public. The Court fully accepts his testimony that the Park Service reasonably relied upon its publications to provide warnings to the public, and that its actions to discourage the use of the unmaintained trails fell within the standards applicable at other large national and state parks.

58. In conclusion, I find that the Park Service's management of the Trail to the Brink of the Lower Falls was reasonable.

*(d) The Plaintiffs' Own Negligence Bars Recovery.*

59. Wyoming is a comparative negligence state. If plaintiffs are 50% or more negligent, however, they may not recover any damages. Wy.Stat. § 1–1–109.

60. The Childers ignored the warnings available to them in the Canyon Warming Hut and by the North Entrance gate. They failed to review any of the maps available in the Canyon Warming Hut nor did they consult with rangers about the status of trails in the Canyon area.

61. The parents did not instruct either of the boys to exercise caution along the Trail to the Brink of the Lower Falls. They proceeded to shortcut the switchbacks, even though a sign specifically prohibited it.

62. The Childers also walked past a winter warning sign along the Lookout Point Trail which stated that footing was hazardous and that caution should be exercised. This warning provided additional guidance to the Childers while walking down the Trail to the Brink of the Lower Falls, since the latter trail was unmaintained. If caution was to be exercised along a maintained trail such as the Lookout Point, equal or greater caution should have been exercised along an unmaintained trail.

63. Mrs. Childers also negligently permitted the boys to get out of her sight. While it is not reasonable to expect that 11 and 13 year old boys would hold their mother's hand while walking down a trail, common sense dictates that youngsters in Yellowstone should be kept within sight. This basic precaution was not followed in this case. Indeed, the evidence indicates that the boys were fully 467.5 feet, or approximately three switchbacks, in front of the mother while they were on the observation deck.

64. Mrs. Childers' failure to stop the boys from shortcutting, or to keep the boys within sight, indicated to them that there were no

dangers associated with this trail. This caused Luke and David to feel more secure at a time when common sense indicated that caution was appropriate. (Testimony of Charles Kelly, child psychologist from Bozeman, Montana)

65. These actions compare unfavorably to the instructions David Magone was given by his father. Mr. Magone testified, and his son confirmed, that he instructed his son to remain within sight of his mother at all times, and that no shortcutting would be permitted. The instructions were given both prior to leaving home, and again before Mr. Magone's departure for Fishing Bridge.

66. The actions of the Childers were all the more unreasonable since they understood that the Trail to the Brink of the Lower Falls was steep, and that there was a sharp drop-off from the observation decks since they had hiked down it the year before. While on Lookout Point Trail on the day of the accident, they could also see that the observation decks at the end of the Trail to the Brink of the Lower Falls were covered with snow.

67. The boys were also of the age when they could be expected to exercise reasonable caution. Wyoming requires children to exercise reasonable care for their own protection. *Stilwell v. Nation*, 363 P.2d 916, 918 (Wy.1961). Indeed, courts have routinely recognized that 11 and 13 year olds should be held to adult standards of negligence. *See, e.g., Stilwell, supra,* ("with respect to the age of the plaintiff [9 years old], no reason has been advanced for considering it a determining factor in this particular case"); *Owen v. Burcham,* 100 Idaho 441, 447, 599 P.2d 1012, 1018 (1979) ("a child of the age of Randall [8 years, 11 months] is capable of negligence"); *Gayhart v. Schwabe,* 80 Idaho 354, 365, 330 P.2d 327, 338 (1958) ("... however, a normal boy, 13 years old has reached an age where a degree of responsibility for his negligence, or contributory negligence is recognized [citations omitted]"); and *Ledbetter v. Ashland Oil & Refining Co.,* 363 S.W.2d 492, 497 (Tx.1962) (an 11 year old should be held "to the adult standard of the ordinarily prudent person").

68. The boys had the responsibility to exercise caution while on the observation decks, particularly since they could see that the guardrails along the lower deck were covered by an ice-encrusted snowdrift. The decision to climb up a snowdrift that had formed between the upper and lower decks so near to the canyon edge was fraught with danger. After slipping down the snowdrift, the decision to retrace their steps made their actions even more unreasonable.

69. The boys' responsibility increased since the evidence demonstrated that they were well acquainted with winter conditions, could differentiate between snow and ice, and were capable of understanding the risks associated with such conditions. (Testimony of Charles Kelly) Indeed, both boys were accomplished skiers who routinely negotiated the expert trails at Bridger Bowl, a ski resort near Bozeman, Montana. Their failure to heed the open and obvious dangers on the observation deck bars their claims.

70. For each of the above reasons, I find that the plaintiffs' own negligence bars their claim.

*(e) The Wyoming Recreational Use Statute Bars Recovery.*

71. The Wyoming Recreational Use Statute ("Act"), Wy.Stat. § 34–19–105, bars claims for injuries suffered in any case where an owner of land does not charge the persons who enter his land for recreational purposes. In the instant case, pursuant to federal regulations, no one younger than 16 is charged to enter the Park. 36 C.F.R. § 71.13(g). Since David Childers was 11 at the time of the accident, his claim is barred under the Act.

72. *Smith v. United States,* 383 F.Supp. 1076 (D.Wy.1974), *aff'd on other grounds,* 546 F.2d 872 (10th Cir.1976), established that in Wyoming, the failure to charge an entrance fee insulates the Park Service. In that case, a fourteen year old entered Yellowstone with his parents, who paid the usual entry fee. Under the same regulation that exists now, persons under sixteen were not charged a fee for entry. The court held that the statutory exemption to the Act did not apply, and that the action was barred.

73. The Ninth Circuit has subsequently recognized the restrictive definition of the

term "charge" as used in the Wyoming Act. In *Ducey v. United States,* 713 F.2d 504, 513, n. 12 (9th Cir.1983), the court, commenting on the *Smith* decision, wrote that the statutory consideration language in the Act was "much more narrowly drafted than ..." those of other states. Other than stylistic changes, there have been no changes to the Wyoming Act since its original promulgation. Given the restrictive nature of the Wyoming Recreational Use Statute, the action must be barred.

74. Plaintiff's expert, Bruce Hronek, testified that if a visitor was not required to pay an entrance charge the Wyoming Recreational Use Act would not apply.

In accordance with the above, I find that no liability can be attributed to the defendant in this case. Therefore, **IT IS ORDERED** that judgment shall be entered in favor of the defendant in this case. Each party shall bear their own costs.

The Clerk of Court is directed to enter judgment accordingly, and shall forthwith notify the respective parties of the making of this order.